**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIREMAN'S FUND INSURANCE COMPANY, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 04-1692C** |
| | ) | **(Judge Christine O.C. Miller)** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

COMES NOW, Plaintiffs, Fireman's Fund Insurance Company, American Home Assurance Company, Fidelity & Deposit Company of Maryland, Universal Underwriters Insurance Company and J.A. Jones Construction Company and Guy F. Atkinson Construction Company, a Joint Venture (collectively, "Plaintiffs") and hereby submit their First Amended Complaint in accordance with the Court's Order dated November 22, 2006.

## I. PREAMBLE

This action arises out of the construction of a Lock and Dam Project on the White River in Arkansas. The Government, among other things, constructively changed the contract and/or breached the contract and the implied duty of the good faith and fair dealing and its duty to not interfere with the contractor's performance of the work by: (1) providing defective specifications relating to the concrete mixes and failing to provide acceptable and workable concrete mix designs for the substantial quantity of concrete on the project, as it was required to do under the contract; and (2) actively creating a labor shortage for the project by affording another project in the area two substantial

contract modifications in order to alleviate problems that project was having with attracting a sufficiently sized and quality labor force. By favoring the competing project over the instant project, the Government significantly increased the time and expense of constructing the Lock and Dam Project. As a result of both the Government-responsible concrete design mix and labor shortage issues, Plaintiffs have incurred significant additional costs as well as delays and impacts to the performance of the project for which it seeks compensation in this litigation.

## II. JURISDICTION AND PARTIES

1. This Court has jurisdiction over this matter pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§601-613, and the Tucker Act, 28 U.S.C. §1491, et. seq.

2. Plaintiffs Fireman's Fund Insurance Company, American Home Assurance Company, Fidelity and Deposit Company of Maryland and Universal Underwriters Insurance Company (collectively, the "Sureties") are engaged in the business of providing surety bonds.

3. The Sureties are the successors in interest and assignees of Plaintiffs J.A. Jones Construction Company and Guy F. Atkinson Construction Company, a Joint Venture ("Jones/Atkinson"), the original contractor on the project.

4. The Defendant is the United States of America, acting through its agency, bureau, instrumentally, and/or agent the Department of Defense, United States Army Corps of Engineers, Little Rock District (the "Corps" or the "Government").

5. Jones/Atkinson submitted a certified claim to the Corps' Contracting Officer on December 26, 2002 relating to the concrete design mix claim and labor shortage claim set forth herein.

6. On September 24, 2003, J.A. Jones Construction Company filed a voluntary petition in bankruptcy in the United States Bankruptcy Court for the Western District of North Carolina. As a result of the bankruptcy proceedings, the Sureties became the estate representatives of Jones/Atkinson for the purpose of prosecuting, liquidating and collecting claims on projects the Sureties had bonded, including the Montgomery Point Lock and Dam Project at issue herein.

7. Prior to the bankruptcy, the Sureties had financed Jones/Atkinson's work on the Project.

8. The Contracting Officer issued a Final Decision on November 21, 2003, finding "partial merit" with respect to the concrete design mix claim and no merit on the labor shortage claim.

9. After submission of the claims at issue herein and the issuance of the Contracting Officer's Final Decision regarding the certified claims, the Sureties entered into a Takeover Agreement with the Corps on or about March 25, 2004, by which Plaintiffs became successors in interest to and assignees of Jones/Atkinson. The Takeover Agreement specifically provides that "The Government acknowledges that the Sureties will have the right to assert all claims of the original Contractor under the Contract or in connection with the performance of the Contract."

10. As a result of the foregoing, the Sureties have the right and standing to maintain this action.

11. On November 19, 2004, Plaintiffs timely filed the original Complaint in this Court.

## III. SPECIAL MATTERS

12. Pursuant to Rule 9(h)(3), the Plaintiffs state that they rely upon Contract No. DACW-03-97-C-0025 and sections 00100, 00600, 00700, 00800 and 00900 thereto, as well as the technical specifications of the Contract, without limiting their rights to utilize other portions of the Contract.

## IV. FACTS

### A. The Contract/Project

13. On July 21, 1997, the Corps awarded Jones/Atkinson Contract No. DACW-03-97-C-0025 (the "Contract") for the construction of the Montgomery Point Lock and Dam on the White River in Desha County, Arkansas (the "Project") in the amount of $186,124,143.50.

14. The Project generally consisted of the construction of a new lock, dam, crest gate dewatering system, diversion channel, channel revetments, dikes, a control tower and mooring area. The Project structure consisted of a 110 foot wide by 600 foot long miter gated concrete lock, two 524-foot concrete floating guide walls, a 300 foot wide bottom lift hinged crest-gated navigable pass concrete spillway and a 200 foot wide fixed crest concrete overflow spillway.

15. Pursuant to the Miller Act (40 U.S.C. §270a) and the terms of the Contract, Jones obtained a Performance Bond in the penal sum of $186,124,143.50 and a Payment Bond in the penal sum of $2,500,000.00 from the Sureties.

16. The Contract required Jones/Atkinson to complete the Project within 1,687 calendar days from the date of Notice to Proceed. By letter dated and received on August 26, 1997, the Corps gave Jones/Atkinson Notice to Proceed, thus establishing a Contract completion date of April 9, 2002, subject to adjustment for excusable delays.

**B. Contract Performance**

**1. The Pine Bluff Arsenal Project**

17. Unbeknownst to Jones/Atkinson, during the timeframe when the solicitation was published for the Montgomery Point Lock and Dam Project, the Corps also solicited for the construction of a large chemical weapon demilitarization facility at the Pine Bluff Arsenal in Pine Bluff, Arkansas (the "Pine Bluff Project").

18. On July 26, 1997, within days of entering into the Contract with Jones/Atkinson, the Corps entered into fixed-price Contract No. DAAA09-97-0098 with the Raytheon Demilitarization Company ("Raytheon") for the construction of the Pine Bluff Project.

19. The United States had entered into a multilateral agreement, The Chemical Weapons Convention ("CWC"), that required the destruction of chemical weapons within specified timeframes. The Pine Bluff Project was apparently a critical component of the United States' meeting its obligations under the CWC.

20. The Pine Bluff Project required large numbers of the same skilled craft workers that Jones/Atkinson needed to construct the Montgomery Point Project.

21. The Pine Bluff Project was scheduled to be completed in May 2000, or nearly two years prior to the completion of the Montgomery Point Lock and Dam Project, and would be finishing up just as Jones/Atkinson was ramping up its hiring at the Montgomery Point Project to begin mass concrete placements.

22. A bid protest on the Pine Bluff Project, however, resulted in a stop work order from August 1997 to May 1, 1998.

23. It was not until October 13, 1998, that the Corps issued a limited Notice to Proceed to Raytheon.

24. The Corps did not issue a full Notice to Proceed to Raytheon until January 15, 1998, apparently due to environmental concerns. The resulting over one-year delay to the Pine Bluff Project had significant political ramifications and placed the Pine Bluff Project and the Montgomery Point Lock and Dam Project in competition for labor forces.

25. The Pine Bluff Project was not completed until November 2002.

26. Pine Bluff, Arkansas is approximately 50 miles from the location of the Montgomery Point Lock and Dam Project.

**2. <u>Early Montgomery Point Project Delays</u>**

27. In January 1999, the Corps suspended work on the Montgomery Point Project due to funding deficiencies. The funding suspension was not lifted until August 1999. Jones/Atkinson received a Contract modification to compensate it for the suspension of work costs.

28. The suspension of work due to lack of Project funding, coupled with the delays at the Pine Bluff Project, placed the Pine Bluff Project and the Montgomery Point Project in direct competition for the same craft labor force beginning in mid-2000, just as the Montgomery Point Project began its major concrete placement efforts.

**3. <u>Concrete Mix Design Deficiencies</u>**

29. Pursuant to the Contract, Jones/Atkinson provided unit prices for the specified components of the concrete (Portland cement, pozzolan, silica fume, water reducing admixture and high-range water reducing admixture). The Corps was responsible for the design of an acceptable concrete mix from those components.

30. Jones/Atkinson selected materials for the concrete mix in accordance with the specifications and relied on the Corps to provide a workable concrete mix.

31. In particular, the Contract specifications, Section 03305, provided:

a. ¶ 2.2.1 Composition

Concrete shall be composed of cementitious materials, water, fine and coarse aggregates, and admixtures. The cementitious materials shall be Portland cement or Portland cement in combination with pozzolan. . . .

b. ¶ 2.1.1.2 Pozzolan Other than Silica Fume

Pozzolan other than silica fume shall conform to ASTM C 618, Class C or F . . . .

c. ¶¶ 2.1.5.1 Aggregate Composition

Fine Aggregate shall consist of natural sand, manufactured sand, or a combination of natural and manufactured sands. Coarse aggregate shall consist of gravel, crushed stone or a combination thereof.

d. ¶ 2.2.2 Proportioning Responsibility

The concrete mixtures will be proportioned by the Contracting Officer. Some mixtures, especially those containing higher amounts of pozzolans, may have slow strength gain, which may impact form design and form removal time.

e. ¶ 2.2.3 Control

The proportions of all material entering into each concrete mixture will be furnished to the Contractor. The proportions may be changed by the Contracting Officer as necessary. . . .

f. ¶ 1.3.1.2 Cementitious Materials, Admixtures, and Curing Materials Notify the Contracting Officer of the source, brand, name, type and quantity of all materials (other than aggregates) to be used in the manufacture and curing of the concrete at least 60 days in advance of submitting samples for mixture proportioning studies. . . . Sampling and testing as determined appropriate will be performed by and at the expense of the Government. . . .

32. Accordingly, the Contract unequivocally provided that Jones/Atkinson was responsible for selecting the type and source of materials for the concrete and the Corps was responsible for providing an acceptable concrete mix design.

33. Concrete operations ultimately began in late June of 2000. Almost immediately, problems with the concrete mix arose, including:

a. Very short setting times, requiring excessive vibration for an extended period of time in order to adequately consolidate the concrete;

b. "Boney" (rocky) consistency of the mix, impeding proper consolidation in areas heavily congested with rebar;

c. Inconsistent behavioral characteristics of the concrete, including early and variable loss of slump, making forming, placing, vibrating and finishing activities unpredictable and requiring longer durations; and

d. Unreasonably long duration to achieve required strength.

34. On August 7, 2000, the Corps suspended mass concrete placements due to the concrete mix problems. In subsequent letters, Jones/Atkinson requested that all

the concrete mix designs for the Project be re-evaluated and re-proportioned to provide concrete that was both workable and compatible with the structural design of the Project.

35. The Corps, for its part, attempted to blame Jones/Atkinson for the concrete problems, first citing Jones/Atkinson's operation of the concrete batch plant, then blaming Jones/Atkinson's concrete sampling procedures. These assertions by the Corps were proven erroneous.

36. Thereafter, on August 18, 2000, without re-designing the concrete mix, the Corps lifted the stop work order on mass concrete placements, and placements resumed on August 22, 2000.

37. The concrete problems continued, however, and quality problems arose with respect to pockets in the concrete placements that required patching and repair by Jones/Atkinson.

38. At least by early September 2000, the Corps internally recognized that there might be problems with its concrete mix design. Concrete testing at the Corps' Waterways Experimental Station ("WES") indicated that substituting Class F Fly Ash for the Class C Fly Ash being utilized at the Montgomery Point Project might solve some of the workability problems.[1]

39. Both Class C and Class F Fly Ash were listed as a suitable component of the concrete mixes.

[1] Fly Ash is a pozzolan material, which is a component of the concrete for the Project in accordance with the specifications.

40. On September 5, 2000, the Corps wrote to Jones/Atkinson dismissing the concerns with the concrete mix design. Notably, the Corps did not inform Jones/Atkinson of the WES study regarding the fly ash.

41. On September 19, 2000, the Corps provided Jones/Atkinson with a copy of the WES study.

42. Thereafter, the Corps continued to attempt to place the blame on Jones/Atkinson for the concrete difficulties, notwithstanding an October 10, 2000 memorandum from WES reiterating that the Class C Fly Ash was the problem with the mix.

43. Due to the continuing problems with the concrete, Jones/Atkinson suspended concrete placements again on October 17, 2000 and demanded that the Corps remedy the defective concrete mix design.

44. Throughout the summer and fall of 2000, Jones/Atkinson informed the Corps that it considered the cost and time associated with the deficient concrete mix to be the Corps responsibility.

45. It was not until October 23, 2000, that the Corps advised Jones/Atkinson that new mix designs would be made utilizing Type F Fly Ash. Thereafter, Jones/Atkinson obtained a source for the Type F Fly Ash and sufficient quantities were delivered to the site in November 2000. Concrete placements restarted on an interim basis on November 17, 2000, until a final mix design could be produced.

46. The Corps did not provide a final mix design until January 2001. Unfortunately, this mix design suffered from deficiencies as well, such as:

a. The mix designs did not take into account the highly reinforced nature of the concrete on the Project. The Corps was reluctant to

allow the use of smaller sized aggregates, thus causing consolidation problems in areas of high concentration of reinforcing steel ("rebar"). It was not until February 2001, that the Corps allowed Jones/Atkinson to switch to smaller aggregate sizes in areas of high rebar density.

b. The Corps' mix designs did not increase the amount of cement in the design to facilitate concrete setting in cold weather conditions. Jones/Atkinson had retained a concrete consultant that had recommended a higher cement content during cold weather conditions.

c. Jones/Atkinson's consultant also recommended the use of natural sand as opposed to manufactured sand, which would allow better consolidation of the concrete.

d. The switch to Class F Fly Ash also caused additional problems, including unreasonably long set times and excessive bleed water – both problems which lengthened the duration of concrete activities.

47. The Corps' refusal to consider adjustments to its mix design as recommended by Jones/Atkinson, apparently due to cost concerns, resulted in additional monies being expended by Jones/Atkinson and delays in the completion of the critical path concrete activities.

**4. <u>Labor Shortage</u>**

48. As part of its bid, Jones/Atkinson evaluated the availability of craft labor in Arkansas and surrounding states. J.A. Jones Construction Company was just finishing up the Arkansas River Dam No. 2 Hydropower Project in the proximity of the

Montgomery Point Project and determined adequately staffing the Montgomery Point Project would require labor to be transported over the river from Mississippi via boats. The transported labor would be supplemented by workers residing in Arkansas. Jones/Atkinson's bid included the costs of boat transportation to the Project site for a majority of its workers.

49. As originally planned, the Pine Bluff Project would have been complete by May 2000, or prior to the time that Jones/Atkinson would be beginning their mass concrete activities at Montgomery Point in June 2000.

50. However, as a result of the delays to the Pine Bluff Project, as noted above, both Projects were competing for the same craft labor when the Montgomery Point Project began concrete activities in June 2000.

51. On February 23, 2000, Raytheon submitted a Request for Equitable Adjustment ("Raytheon REA") to the Corps' Contracting Officer in the Huntsville District. The Raytheon REA requested additional monies for increased labor costs being incurred by Raytheon due to the Corps-responsible delays that placed the Pine Bluff Project into competition for labor with other construction projects in the vicinity, including the Montgomery Point Project.

52. Raytheon repeatedly asserted in its REA that it could not and did not anticipate the labor shortage it was incurring and a modification to the contract was required in order for Raytheon to attract more labor and timely complete the high-profile and politically significant Pine Bluff Project.

53. In fact, Raytheon admitted in its REA that that, if it were to bid the Pine Bluff Project again, it "would have evaluated the factors for labor availability and

included an allowance for travel expenses to draw more workers." Notably, Jones/Atkinson had taken into account such travel expenses in its bid.

54. Raytheon requested the contract modification in order to:

a. increase its wage rates to attract more craft personnel;

b. provide travel allowance and per diem in order to attract labor from further distances from the Pine Bluff Project site;

c. work an extended schedule (5 days, 10 hours per day) in order to attract more workers and to meet the Pine Bluff Project schedule; and

d. hire a full-time labor relations manager to locate and retain skilled craft labor.

55. Through the higher wages and increased hours, Raytheon intended to attract more Arkansas workers to the Pine Bluff Project. By the use of per diems and travel allowances, Raytheon intended to recruit employees from more distant areas, including out-of-state workers.

56. On May 19, 2000, the Corps-Huntsville executed a modification to Raytheon's contract for the Pine Bluff Project that increased the contract price by $22.5 million in response to Raytheon's REA. The modification maintained the current contract completion date of December 7, 2001.

57. The Corps' internal negotiation memorandum relating to the Raytheon REA indicated that the Corps recognized that the Pine Bluff Project was suffering a labor shortage through increased competition from other projects and that the modification was necessary for Raytheon to attract sufficient craft labor to the project.

58. As a result of the $22.5 million modification given to Raytheon on the Pine Bluff Project, the Corps solved Raytheon's labor shortage problem, but consequently created a labor shortage for Jones/Atkinson on the Montgomery Point Project.

59. As noted earlier, Jones/Atkinson was ramping up their construction activities with a scheduled start of the mass concrete portion of the Project scheduled to begin (after consideration of the earlier funding shutdown of the Project) in June 2000. One month earlier, Raytheon was afforded a substantial contract modification to alleviate its labor shortage difficulties. Consequently, Jones/Atkinson was unable to hire and retain sufficient manpower for the Montgomery Point Project as planned due to the labor shortage created by the Corps.

60. Jones/Atkinson encountered the Corps-created labor shortage immediately upon attempting to mobilize its manpower for the Project mass concrete work:

a. The Pine Bluff Project was able to substantially increase its labor force from distant areas, including out-of-state, where Jones/Atkinson had previously been successful in attracting workers. The number of these "traveler" workers was increased significantly at Pine Bluff whereas at Montgomery Point, Jones/Atkinson was unable to hire and retain its planned number of "traveler" workers and the requisite number to achieve its scheduled performance.

b. The Pine Bluff Project was able to hire a disproportionate share of the Arkansas labor force following the modification.

c. The Montgomery Point Project lost J.A. Jones personnel to the Pine Bluff Project that had previously worked on the Arkansas River Dam No. 2 Hydropower Project.

61. Raytheon was successful in enticing craft labor away from the local labor market, including the Montgomery Point Project. Raytheon's success was subsidized wholly by the Corps' modification to the Pine Bluff contract to the great detriment of the Montgomery Point Project.

62. The Corps issuance of the modification to the Pine Bluff contract was unknown to Jones/Atkinson at the time (May 2000).

63. Moreover, the Corps issued a further modification to the Raytheon Contract on November 2, 2001, converting the fixed-price contract to a cost-reimbursable contract, so that Raytheon could accelerate the Pine Bluff Project.

64. In fact, Jones/Atkinson, although clearly suffering through a labor shortage, was unaware that the labor shortage had been created by the Corps through its actions at Pine Bluff until approximately February 2002, when a subcontractor complained to Jones/Atkinson that Pine Bluff was paying higher wages and benefits as a result of a Corps' modification to the Pine Bluff Contract and thereby drawing labor away from the Montgomery Point Project.

65. Jones/Atkinson only became aware of the full scope of the labor shortage created by the Corps' actions at Pine Bluff when it received documents from the Corps pursuant to a Freedom of Information Act request on April 30, 2002.

## Count I

**Concrete Design Mix Claim**

**(Breach of Implied Warranty of Specifications/Defective Specifications)**

66. Plaintiffs incorporate by reference the allegations contained within Paragraphs 1 through 65 of this Complaint as if set forth fully herein.

67. The specifications regarding the concrete design mix permitted Jones/Atkinson to select the materials from listed sources. Thereafter, the Corps would design a concrete mix utilizing the selected materials.

68. As a design specification, the Corps provided a warranty that the concrete mix it designed would achieve an acceptable result.

69. Jones/Atkinson reasonably relied upon the Corps' specifications in making their material selections for the concrete mix, selecting products and sources provided in the specifications.

70. The Corps' specifications, however, turned out to be defective in that upon selection of listed materials, the Corps' concrete mix was unworkable and not able to achieve an acceptable result.

71. As a result of the Corps' defective specifications and the consequent unsuitability of the concrete mix, Jones/Atkinson incurred additional direct costs and experienced delays and impacts in its performance of the Project.

72. Subsequently, the Corps designed a concrete mix utilizing Type F Fly Ash, as opposed to the Type C originally selected by Jones/Atkinson in accordance with the specifications.

73. The switch to Type F Fly Ash solved some, but not all, of the issues with the workability of the concrete. Jones/Atkinson incurred additional costs and delays in attempting to place the revised concrete mix.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor on Count I and award Plaintiffs monetary damages in an amount to be proven at trial, a time extension to the Contract as determined at trial, plus statutory interest, attorneys fees and expenses as appropriate and for such further relief as the Court may deem just and proper.

## Count II

### Labor Shortage

### (Breach of the Implied Duty of Good Faith and Fair Dealing, and the Implied Duty of Cooperation and Non-Interference)

74. Plaintiffs incorporate by reference the allegations contained within Paragraphs 1 through 73 of this Complaint as if set forth fully herein.

75. Through its actions with respect to the Pine Bluff Project, the Government created a shortage of labor at the Montgomery Point Project.

76. The Government's actions relating to the Pine Bluff Project were unknown to Jones/Atkinson until sometime in early 2002, long after Jones/Atkinson had experienced the consequences of the Government's actions.

77. As a result of the Government-caused labor shortage, Jones/Atkinson incurred monetary damages by having to increase the wages and benefits it paid to craft workers to attract and maintain the workers, increasing allowances and per diems paid to attract qualified workers, and expending additional staff time to recruit workers.

78. Moreover, Jones/Atkinson suffered delays in its performance of the Project and reduced productivity as the result of a reduction in its planned craft labor force, high worker turnover and being forced to hire marginally qualified workers in order to attempt to meet the manpower requirements for the Project.

79. The Government's actions at the Pine Bluff Project constitute a constructive change and/or Government breach of contract by the Corps' failure to comply with its duty of good faith and fair dealing, including the duty to cooperate and not to hinder the performance of the Contract.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor on Count II and award Plaintiffs damages in an amount to be proven at trial, a time extension to the Contract as determined at trial, plus statutory interest, attorneys fees and expenses as appropriate and for such further relief as the Court may deem just and proper.

## **Count III**

## **Labor Shortage**

## **(Constructive Change)**

80. Plaintiffs incorporate by reference the allegations contained within Paragraphs 1 through 79 of this Complaint as if set forth fully herein.

81. The Corps constructively changed the Contract by actively creating a labor shortage for the Montgomery Point Project by favoring the Pine Bluff Project through the issuance of modifications so that Raytheon could preferentially attract labor to its project.

82. Jones/Atkinson investigated the labor market during the bidding phase of its Contract and made reasonable assumptions concerning the availability of labor.

83. The Corps' actions with respect to the Pine Bluff Project constitute a change to the Jones/Atkinson Contract which Jones/Atkinson could not have anticipated.

84. As a result of the constructive change, Jones/Atkinson incurred monetary damages by (i) having to increase the wages and benefits it paid to craft workers to attract and maintain the workers, (ii) increasing allowances and per diems paid to attract qualified workers, and (iii) expending additional staff time to recruit workers.

85. Jones/Atkinson also experienced delays in its performance of the Project and reduced productivity as a result of the reduction in its planned craft labor force, high worker turnover and being forced to hire marginally qualified workers in order to man the Project, for which the Government is responsible.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor on Count III and award Plaintiffs damages in an amount to be proven at trial, a time extension to the Contract as determined at trial, plus statutory interest, attorneys fees and expenses as appropriate and for such further relief as the Court may deem just and proper.

## Count IV

## Labor Shortage

## (Non-Disclosure of Superior Knowledge)

86. Plaintiffs incorporate by reference the allegations contained within Paragraphs 1 through 85 of this Complaint as if set forth fully herein.

87. The Government had superior knowledge of the existence of the modifications to the Pine Bluff Project and knew or should have known that the

modifications would create labor difficulties and shortages for the Montgomery Point Project.

88. Jones/Atkinson had no reason to know of the Corps' actions with respect to the Pine Bluff modifications and the Corps' effort to assist Raytheon in attracting labor to the Pine Bluff Project to the detriment of the Montgomery Point Project.

89. The Corps knew or should have known that Jones/Atkinson was unaware of the Corps' actions with respect to the Pine Bluff Project.

90. The Corps had a duty to disclose such superior knowledge concerning the Pine Bluff Contract Modifications to Jones/Atkinson.

91. The Corps failed or refused to disclose its superior knowledge to Jones/Atkinson.

92. As a result of the Corps' failure or refusal to disclose its superior knowledge, Jones/Atkinson incurred monetary damages by (i) having to increase the wages and benefits it paid to craft workers to attract and maintain the workers, (ii) increasing allowances and per diems paid to attract qualified workers, and (iii) expending additional staff time to recruit workers.

93. Jones/Atkinson also experienced delays in its performance of the Project and reduced productivity as a result of the reduction in its planned craft labor force, high worker turnover and being forced to hire marginally qualified workers in order to man the Project, for which the Government is responsible.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor on Count IV and award Plaintiffs damages in an amount to be proven at trial, a time extension to the Contract as determined at trial, plus statutory interest, attorneys

fees and expenses as appropriate and for such further relief as the Court may deem just and proper.

Respectfully submitted this 8th day of January, 2007.

/s/ Robert G. Watt
Robert G. Watt, Esquire
WATT, TIEDER, HOFFAR & FITZGERALD, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000
Fax (703) 893-8029
rwatt@wthf.com

Attorneys for Plaintiffs

Of counsel:

Keith C. Phillips, Esquire
WATT, TIEDER, HOFFAR & FITZGERALD, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000
Fax (703) 893-8029
kphillip@wthf.com