**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **FIREMAN'S FUND INSURANCE COMPANY, et al.,** ) | |
| **Plaintiffs,** ) | **Case No. 04-1692C** **(Judge Christine O.C. Miller)** |
| **v.** ) | |
| **THE UNITED STATES OF AMERICA,** ) | |
| **Defendant.** ) | |

**<u>Plaintiffs' Statement of Claim</u>**

Pursuant to the Court's Order dated July 21, 2008, Plaintiffs Fireman's Fund Insurance Company, American Home Assurance Company, Fidelity and Deposit Company of Maryland, Universal Underwriters Insurance Company and J.A. Jones Construction Company and Guy F. Atkinson Construction Company, a Joint Venture ("Plaintiffs"), by counsel, hereby submit their mutual Statement of Claim regarding the labor shortage created by the U.S. Army Corps of Engineer's ("Corps" or "Corps of Engineers") at the Montgomery Point Lock and Dam Project in Arkansas.

## I. <u>Introduction</u>

Plaintiffs' Labor Shortage Claim ("Claim") arises out of the two largest construction projects in the state of Arkansas that were being built simultaneously by the same Owner – the Corps of Engineers. The first of the two Projects to start was the construction of the Montgomery Point Lock and Dam Project ("Montgomery Point" or "Montgomery Point Project"), which was awarded on July 21, 1997, and finished 3.5 years beyond the scheduled completion date. The second and larger project, Pine

Bluff, was awarded four days later than Montgomery Point on July 25, 1997. The Pine Bluff Project ("Pine Bluff" or "Pine Bluff Project") was much higher profile in Washington, D.C. because it involved a disarmament of chemical weapons by a stated deadline in compliance with a multilateral treaty which included the United States and Russia. Even though the two Projects were only 58 miles apart and competed in the same labor market, the same Owner, the Corps of Engineers, decided to issue a $23 million Contract Modification to the Pine Bluff Project for the express purpose of attracting labor to the Pine Bluff Project during a time period when the Arkansas labor market was already competitive.

In this Statement of Claim, the Plaintiffs assert that the Pine Bluff Modification caused a substantial and detrimental government-caused labor shortage at Montgomery Point, thereby significantly delaying Project completion. In order to demonstrate the causal relationship, Plaintiffs will establish: the Corps provided the Pine Bluff Modification so that the Pine Bluff contractor, Raytheon, could utilize the approximately $23 million granted in the Modification to increase its labor wages and benefit package so that it could hire labor that would otherwise work at other projects, including the Montgomery Point Project. Not unexpectedly and as a result, the Montgomery Point Project was unable to recruit sufficient manpower required for its planned concrete operations (particularly in 2001 and 2002), and the Montgomery Point contractor experienced significant increased costs and delays.

This Statement of Claim will describe the facts surrounding Plaintiffs' Claim that are particularly relevant to the legal theories for recovery. Plaintiffs will then apply these facts to three appropriate legal theories: (1) the superior

knowledge doctrine; (2) the duty of good faith and fair dealing; and (3) constructive change.

## II. **Relevant Facts**

### A. **Events Prior to the Pine Bluff Modification**

On July 21, 1997, the Corps awarded firm, fixed-price Contract No. DACW03-97-C-0025 (the "Montgomery Point Contract") to J.A. Jones Construction Company and Guy F. Atkinson Construction Company, a Joint Venture (the "Joint Venture") in the amount of One Hundred Eighty-Six Million, One Hundred Twenty-Four Thousand, One Hundred Forty-Three Dollars and Fifty Cents ($186,124,143.50) to construct the Montgomery Point Lock and Dam on the White River in Desha County, Arkansas (the "Montgomery Point Project" or "Montgomery Point"). The Montgomery Point Project generally consisted of constructing a new lock, dam, crest gate dewatering system, diversion channel, channel revetments, dikes, control tower and mooring area. The Project structure consisted of a 110-foot-wide by 600-foot-long miter gated U-frame concrete lock, two 524-foot concrete floating guide walls, a 300-foot-wide bottom lift hinged-crested gated navigable pass concrete spillway, and a 200-foot-wide fixed crest concrete overflow spillway. The Corps' solicitation included detailed drawings and specifications for the prospective contractor.

During the Montgomery Point Project bidding process, the Corps also issued a solicitation for construction of the Pine Bluff Project. The Pine Bluff Project involved the construction of incinerators to destroy chemical weapons located at the Pine Bluff Arsenal. The Pine Bluff Project required large numbers of the same skilled craft workers that the Joint Venture needed to construct the Montgomery Point Project. The

Pine Bluff Contract was awarded to Raytheon on a fixed-price basis, four days after the award to the Joint Venture.

The original completion date at Montgomery Point necessitated an aggressive construction schedule by the Joint Venture, with the most significant work being the production and placement of concrete. The Joint Venture's initial baseline schedule, which included formwork, rebar, batching, placing, finishing and support, required an estimated 613,453 man-hours to achieve completion. As a result, the Joint Venture anticipated hiring a significant number of employees just prior to the production and placement of concrete. Both the Montgomery Point and Pine Bluff Projects experienced Government-caused delays, and, as a result, the two Projects' schedules significantly overlapped. In December 1997, work at the Montgomery Point Project was suspended due to a Corps funding shortage. The Project did not startup again until August 1998. As a result, concrete placement was delayed until late June of 2000 and the Project completion date was extended to November 14, 2002. Importantly, the Joint Venture did not attempt to hire employees for the placement of concrete until just prior to June 2000.

The Corps also ran into delays in the construction of the Pine Bluff Project that jeopardized the timely disposal of chemical weapons at the Pine Bluff Arsenal as required by an international agreement. The Pine Bluff Project was originally scheduled for completion in May 2000 (prior to the Joint Venture's revised schedule for beginning concrete placement). In August 1997, the Corps issued a stop work order for the Pine Bluff Project as the result of a bid protest. The stop work order was not canceled until May 1, 1998. Thereafter, on October 13, 1998, the Corps issued a limited Notice to

Proceed for the construction work. The Corps did not issue a full Notice to Proceed to Raytheon until January 15, 1999, as a result of delays in acquiring Arkansas Environmental Quality permits. Due to these Government delays, the Pine Bluff Project completion date was extended to December 7, 2001, placing Pine Bluff in direct competition for labor for concrete placement activities with Montgomery Point.

The Pine Bluff Project construction schedule was of great importance to the Government due to political ramifications arising from a multilateral agreement to dispose of chemical weapons. The Chemical Weapons Convention (the "CWC") is a multilateral treaty that bans chemical weapons and requires their destruction within a specified period of time. The United States signed the CWC and it became effective on April 29, 1997. Among other things, the CWC requires the state-parties to destroy all chemical weapons in their jurisdiction or control based on the following schedule: (1) Phase I – 1% reduction in chemical weapons by April 2000; (2) Phase II – 20% reduction by April 2002; (3) Phase III – 45% reduction by April 2004; and (4) Phase IV – 100% reduction by April 2007. The CWC allows extensions of the phase deadlines, but April 2012 is a mandatory deadline that cannot be extended.

The CWC also permits the Organization of the Prohibition of Chemical Weapons (the "OPCW") to punish state-parties found in non-compliance with the CWC's schedule requirements. The OPCW can punish breaching state-parties through restrictions or suspensions of CWC-related rights and privileges, punitive measures, or the OPCW can raise non-compliance issues before the United Nations Security Council. Any delay in the construction of chemical weapons disposal facilities jeopardized the United States' ability to meet the CWC schedule.

Despite this, due to delays encountered, the original completion date of May 2000 for the Pine Bluff Project could not be met. After the initial delays occurred, the Corps attempted to maintain a new completion date of December 7, 2001.

**B. <u>The Pine Bluff REA Proposal</u>**

Raytheon submitted a Request for Equitable Adjustment Proposal Part B (the "REA Part B" or the "REA") on February 23, 2000 to the Contracting Officer at the Corps' office in Huntsville, Alabama. The REA Part B was a claim for Raytheon's estimated increased labor costs to attract, hire and retain qualified workers for the Pine Bluff Project due to a competitive labor market in the area. Raytheon asserted entitlement to the REA based on "experiences during the past year and the economic factors that have shown substantial changes in the availability of workers in the heavy construction industry." In the REA, Raytheon claimed four areas of entitlement: (1) Labor Rate Parity; (2) Travel Allowance and Daily Per Diem; (3) Extended Schedule; and (4) a Labor Relations Manager.

**1. <u>Labor Rate Parity</u>**

Based on the Pine Bluff Project shutdowns and delays caused by the stop work order and the tardy Notice to Proceed, Raytheon requested an adjustment to increase wage rates. The wage rate increase was necessary because Raytheon "could not foresee that both the labor changes in availability and the new projects in the area would create increased craft competition." Raytheon further explained that increased wage rates would "benefit the project further by attracting more craft personnel. Due to the labor availability . . . and the start of other project [sic] in the area, this action needs to be taken to improve the quantity and quality of manual craft on the project."

**2. Travel Allowance and Daily Per Diem**

Raytheon also requested increased travel allowances and per diems because it "expect[ed] to incur increased costs for attracting craft [labor] to the site." Raytheon again rationalized its request because "[n]either the Contractor nor the Government could have foreseen that additional costs would be required to attract and retain the craft labor at the Pine Bluff project . . . ." According to Raytheon, when the initial bid was made "there were few other construction projects in work in the area and there were more workers available ('bench strength') for work on this project." Raytheon hypothesized it would have bid the Project differently if it had known startup would occur in January 1999: "Raytheon would have evaluated the factors for labor availability and included an allowance for travel expenses to draw more workers to the site for execution of the work in 1999 through 2001" (emphasis added).

In explaining the proposed per diem and travel allowance system, Raytheon distinguished between local employees located 80 miles or less from the Pine Bluff Project and "the long distance travelers ([located] over 80 miles)." Raytheon proposed that the long distance travelers would receive a travel per diem of $40 per work day "for travel, temporary housing, food and expenses." Raytheon emphasized that the main purpose of the increased travel allowances and per diems was to increase the number of "long distance travelers" (located further than 80 miles away) employed at the Project:

> The requirements for increasing the quantity of craft at the site will require that more of the craft workers are located outside of the area. Therefore there will be a shift to more workers drawn from outside of the area. The Contractor expects that based on bench strength, it will require as much

> as 30% of its workforce from outside of the area (e.g., outside of the state) (emphasis added).

Additionally, Raytheon essentially proposed shifting the Pine Bluff Project from a Union project to open shop: "[T]he Contractor estimates that the necessary quantity of workers will be drawn from the non-union groups or open shop workers. Non-union, qualified workers will be drawn to the project from outside of the area by offering the travel allowance and travel per diem." Raytheon wanted to hire non-union employees, while remaining a union job, by providing the non-union employees with reimbursement or payment of their union dues. Through the use of travel allowances and per diems, Raytheon intended on targeting non-union employees from outside of the state. Raytheon asserted that travel allowances and per diems were necessary to allow it to compete with other projects for labor:

> Raytheon expects that the allowances will be necessary to be at parity with other projects and to allow us to be competitive with the other project in the area. These actions, in conjunction with other actions we have taken and propose to take, we [sic] will be able to attract the qualified crafts necessary to complete this project with in [sic] the construction schedule (emphasis added).

Through travel allowances and per diems, Raytheon intended to target non-union employees from outside the state of Arkansas that would have worked at other projects but for the Modification.

### 3. **Extended Schedule**

In requesting an extended ten hour work day, five days per week schedule, Raytheon again repeated its mantra that it could not and did not anticipate the labor problem: "The extended 5x10 work week schedule are [sic] necessary, in addition to

the wage parity and travel/per diem allowance actions, as a result of the development of the other projects in the area." The extended schedule and increased overtime would allow Raytheon to "attract and retain those workers who would be drawn to other projects in the area." Raytheon also asserted that second shifts would be necessary to offset the loss of productivity caused by the increased overtime.

#### 4. <u>Labor Relations Manager</u>

Additionally, Raytheon sought funds for a full-time Labor Relations Manager to replace the previously used part-time labor relations employee. This new position was necessary because of "extensive changes in the labor situation in 1999-2001 . . . ." The Labor Relations Manager was to assist in "locating and retaining the quantity and skill levels of craft necessary for the execution of the project schedule . . . ."

### C. <u>Corps of Engineers' Issuance of The Pine Bluff Modification</u>

On May 19, 2000, the Contracting Officer for the Corps – Huntsville executed the Pine Bluff Modification Part B. The Pine Bluff Modification Part B increased the Contract price by $22,500,000.00 and served as a settlement for all costs and time issues associated with Raytheon's REA Part B. Additionally, the "modification require[d] the contractor to complete the project within the current contract performance period, and eliminate[d] the need for any extensions to the current contract completion date of 07 December 2001."

During negotiations for the Modification, the Government prepared a "Pre-Negotiation Objective Addendum One," which assessed the validity of the REA Part B. The Addendum adjusted the Pre-Negotiation Objective to a range of $22,284,662 -

$22,909,465; Raytheon's REA Part B originally requested $23,965,790. A Contracting Officer for Corps – Huntsville signed the Addendum in concurrence with the Objectives.

Throughout the Addendum, the Corps focused on the competition Pine Bluff faced from other projects: "It is evident that the project has now entered into the stage where new projects in the competing Arkansas area(s) are having an impact on [Pine Bluff's] ability to draw the needed quality and quantity of labor resources."

The Joint Venture only became fully aware of the scope of the Government's actions at Pine Bluff when it received correspondence from its subcontractor, Plateau Electric, regarding the Pine Bluff Modification, in February 2002. On April 15, 2002, the Joint Venture received a full copy of the REA Part B from John R. Herrig, attorney for Morrison Construction Services, Inc. Interestingly, Morrison Construction Services, Inc. was a subcontractor for Raytheon at the Pine Bluff Project and sued Raytheon on January 2002 because Raytheon misrepresented the labor conditions at Pine Bluff. The suit subsequently settled.

### D. <u>The Effects of the Pine Bluff Modification at Montgomery Point</u>

To understand how the Pine Bluff Modification impacted the Montgomery Point Project, it is important to understand the status of construction at Montgomery Point when the Modification was issued. As previously discussed, the Montgomery Point Project began producing and placing concrete in June 2000. As a result, the Joint Venture anticipated that it would start hiring in May 2000 a significant portion of its labor force just prior to commencing the labor intensive concrete operations.

The Pine Bluff Modification was issued on May 19, 2000 and the resulting increased hiring effort at Pine Bluff would have occurred after May 2000. Thus, the

planned labor retention at Montgomery Point and the increased hiring at Pine Bluff as a result of the Modification directly overlapped and completed against each other. Consequently, the impact of the Modification can not be determined through employees that went from Montgomery Point to Pine Bluff or vice-versa. Instead, both Projects ramped up their recruiting of new employees at the same time and the impact of the Pine Bluff Modification can be determined by looking at the new employees which were hired at both Projects after the Modification was issued.

Initially, when Montgomery Point entered its most significant hiring period starting in May of 2000, the Joint Venture essentially was able to meet its labor plan. As can be seen in the graph (below), after June 2000, the Montgomery Point Project began to experience a serious labor shortage. Simultaneously, in July 2000, Pine Bluff began benefiting from the Modification. The full impact of the Pine Bluff Modification and the resulting Montgomery Point labor shortage did not occur until January 2001. The Pine Bluff Modification did successfully alleviate Pine Bluff's labor shortage but, as a result, it caused a significant labor shortfall at Montgomery Point to the severe detriment of the Joint Venture.




There were two labor markets affected by the Pine Bluff Modification that caused the Montgomery Point labor shortage. First, the Modification resulted in a substantial increase in the number of travelers[1] hired by Pine Bluff, which reduced the number of travelers that could be retained by Montgomery Point. This was the result of the per diem and travel allowances that Raytheon began paying after the Pine Bluff Modification was executed. Second, Pine Bluff hired a disproportionate segment of the Arkansas labor force after the Modification was issued. This increase in Arkansas labor retentions was also the result of the higher wages, per diems, travel allowances, overtime and benefits arising from the Labor Relations Manager, all of which were accomplished due to the Pine Bluff Modification. The Pine Bluff Modification impacted these two labor categories and cumulatively created the Montgomery Point labor shortage.

### 1. <u>Labor Shortage Timeline</u>

In preparation for the startup of concrete placement operations which began in late June 2000, the Joint Venture needed to begin hiring a substantial labor force in May

---

[1] Travelers are employees whose permanent residences are not located close to the project jobsite and require temporary housing.




and early June. Graph 1 indicates that Montgomery Point did begin to substantially increase its labor force in June 2000.

Graph 1 also indicates that Raytheon's recruitment efforts significantly benefited from the Modification in July 2000. Early benefits of the Modification are most apparent in Raytheon's recruitment of Arkansas employees. As Graph 2 shows (below), starting in July of 2000, Raytheon experienced a surge in Arkansas employees hired. A similar surge in Raytheon's travelers did not occur until January 2001.




It is not surprising that benefits of the Pine Bluff Modification were first reflected in the increases in Raytheon's Arkansas labor force. Even before the Modification, Raytheon was recruiting the Arkansas labor market, so it only had to locally advertise

the increase in wages and overtime through its existing recruiting system to augment this segment of its labor force. On the other hand, Raytheon was not focused on recruiting the traveler labor market prior to the Modification and, consequently, it had to undertake extensive advertising and recruiting efforts to attract this segment of the labor force.

The combination of Raytheon's increase in labor hiring in July of 2000 and continuing thereafter, and Montgomery Point's concurrent decrease in its ability to fulfill its labor force needs (See Graphs 1 and 2), represents proof that Montgomery Point's labor shortage was directly related to and caused by the increased hiring at Pine Bluff that resulted from the Corps' Modification. Furthermore, according to Graph 2, Raytheon's most significant traveler hiring period started in January 2001 and continued until September 2002. On the other hand, Montgomery Point faced its most severe labor shortage between January 2001 and September 2002, when Raytheon was successfully recruiting both Arkansas and traveler employees.

### 2. **Travelers**[2]

Prior to the Pine Bluff Modification being issued May 19, 2000, Montgomery Point was successfully recruiting traveler labor, particularly from Mississippi, Louisiana,

---

[2] "Travelers" are employees whose permanent residences are not located close to the project jobsite and require temporary housing during employment. To determine travelers eligible for a per diem, the Joint Venture used a 100 mile radius based on driving distance from Rosedale, Mississippi: "$20/day per diem is paid to skilled crafts recruited 100+ miles from jobsite." Rosedale was used to determine an employee's distance from the jobsite because employees obtained boat transportation from Rosedale to the jobsite and Montgomery Point employees were paid for travel time from Rosedale to the jobsite. For the purposes of this request, Montgomery Point employees with permanent residences outside Arkansas greater than 100 miles from Rosedale are travelers; otherwise they are locals.

Raytheon also delineated between travelers and locals based on an employees travel distance to the Pine Bluff jobsite from their permanent residence: "Those who live beyond the 80-mile driving distance would receive a fixed amount of $40.00 per workday for travel, temporary housing, food and expenses." For this request, Pine Bluff employees with permanent residences greater than 80 miles from Pine Bluff are travelers; otherwise they are locals.

Texas, Florida, Alabama, Tennessee and Oklahoma, as it anticipated doing in its Bid. Montgomery Point hired 21 travelers from Mississippi, 11 travelers from Louisiana, 6 travelers from Texas, 5 travelers from Florida and 2 travelers each from Alabama, Tennessee, and Oklahoma prior to the Modification. These numbers are relatively small because Montgomery Point had not entered its most significant hiring period for concrete operations before the Modification as previously discussed.

Comparatively, prior to the Modification, Pine Bluff was not paying travel allowances or per diems and, as a result, not hiring meaningful numbers of travelers: Pine Bluff hired 4 travelers from Mississippi, 5 travelers from Texas, 1 traveler from Florida, 4 travelers from Oklahoma and no travelers from Louisiana, Alabama, or Tennessee during this time period.

Overall, before the Pine Bluff Modification, Montgomery Point hired 69 travelers, while Pine Bluff hired only 26 travelers, <u>despite the fact that Montgomery Point had not entered its substantial hiring period for concrete placement and Pine Bluff had undertaken in earnest concrete construction operations</u>. Pine Bluff placed greater emphasis on recruiting the Arkansas labor market before the Modification, as it hired 626 Arkansas employees during this time period. The disparity between traveler and Arkansas employees hired at Pine Bluff before the Modification is not surprising considering that Raytheon did not pay per diem or travel allowances to travelers before the Modification.

The Pine Bluff Modification, among other things, allowed Pine Bluff to begin actively recruiting travelers from outside of Arkansas. As previously discussed, one of the stated purposes of the Pine Bluff REA was to begin paying travel per diems so that

Pine Bluff could increase its labor force located greater than 80 miles away. The payroll data indicates that Pine Bluff was successful in this recruiting effort. After the Modification, Pine Bluff hired 98 Mississippi travelers, 227 Texas travelers, 17 Florida travelers, 48 Oklahoma travelers, 230 Louisiana travelers, 67 Alabama travelers and 64 Tennessee travelers. Overall, after the Modification, Pine Bluff hired 870 travelers, compared to the 26 travelers it hired prior to the Modification. These traveler employees were hired from the same labor pool that the Montgomery Point Project was relying on prior to and after the Modification.

When the Pine Bluff Modification was issued on May 19, 2000, Montgomery Point was entering its most substantial hiring period to facilitate start-up of concrete placement in June 2000. Despite this, Montgomery Point failed to benefit from an increase in travelers hired to the same degree as Pine Bluff, even though Montgomery Point, by its pre-bid plan, was much more reliant on the traveler labor force. After the Modification, Montgomery Point hired 138 Mississippi travelers, 86 Louisiana travelers, 23 Texas travelers, 5 Florida travelers, 38 Alabama travelers, 73 Tennessee travelers and 1 Oklahoma traveler for a total of 419 travelers compared to Pine Bluff's 870 travelers. (See Graph 3 below).

**Graph 3**

| Traveler Hires | MS | TX | FL | OK | LA | AL | TN | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **PB Pre-Mod** | 4 | 5 | 1 | 4 | 0 | 0 | 0 | 26 |
| **PB Post-Mod** | 98 | 227 | 17 | 48 | 230 | 67 | 64 | 870 |
| **MP Pre-Mod** | 21 | 6 | 5 | 2 | 11 | 2 | 2 | 69 |
| **MP Post-Mod** | 138 | 23 | 5 | 1 | 86 | 38 | 73 | 419 |

From this analysis, it is apparent that before the Modification, Montgomery Point was successfully recruiting traveler employees from Mississippi and other states, as it reasonably planned in its bid. With the startup of concrete placement, Montgomery Point anticipated that its hiring needs could be met through the retention of travelers. When the Corps issued the Modification to alleviate Pine Bluff's labor shortage, Raytheon subsequently began to recruit heavily outside of Arkansas for the first time. The Modification's effect on Pine Bluff's hiring practices are obvious: before the Modification, Pine Bluff hired 26 employees outside Arkansas; after the Modification this number jumped to 870 employees. Clearly, but for the Modification, Pine Bluff could not have successfully recruited outside of Arkansas without incurring non-reimbursable costs (per diems and travel allowances). Without the Pine Bluff Modification, and considering (i) Raytheon's and the Joint Venture's bid intentions discussed herein, and (ii) the Pre-Mod results reflected in Graph 3, a substantial portion of the 750 travelers from Mississippi, Texas, Florida, Oklahoma, Louisiana, Alabama and Tennessee out of the 870 travelers hired at Pine Bluff after the Modification, would have been employed by the Joint Venture at Montgomery Point.

**3. <u>Arkansas Employees</u>**

Raytheon initially bid the Pine Bluff Project under the assumption that recruitment of employees from outside Arkansas was unnecessary because the Arkansas labor force was sufficient. As a result, Raytheon did not offer travel allowances or per diems and hired 626 Arkansas employees and only 26 non-Arkansas employees prior to the Modification. Comparatively, the Joint Venture, based on experience at the Arkansas Hydropower Project, intended to supplement out-of-state labor with Arkansas

employees. Unlike the Pine Bluff Project, Montgomery Point had not entered its substantial hiring period prior to the Modification, so it only hired 110 Arkansas employees prior to May 2000.

After the Modification, Pine Bluff hired 1214 Arkansas employees. Despite entering its most significant hiring period, Montgomery Point was only able to hire 432 Arkansas employees after the Modification was issued. Pine Bluff's 1214 Arkansas employees constitutes 51% of all Arkansas employees hired at the Pine Bluff and Montgomery Point Projects. Because of the Modification, wages were raised at Pine Bluff and Raytheon was able to hire a disproportionate portion – over half – of the available Arkansas labor force.




### 4. Montgomery Point Recruiting

As previously explained, the Joint Venture bid the Montgomery Point Project based, in part, on the labor conditions encountered by J.A. Jones at the Arkansas Hydropower Project. Despite these reasonable assumptions, the Corps' issuance of the Modification for the Pine Bluff Project, created a labor shortage at the Montgomery Point Project. As a result, the Joint Venture had to go to extraordinary efforts to attract even the nominal, inadequate levels of manpower that were attained.

The Joint Venture reasonably set wage rates for the Montgomery Point Project above Davis-Bacon wages established for the area. Despite this, the Joint Venture progressively increased wage rates throughout the duration of the Project in order to try and attract sufficient manpower. Furthermore, the Joint Venture had a policy to maintain current employee wages within 5 percent of increased wage rates paid to new employees. The Joint Venture also provided relocation pay that was not anticipated at bid time to attempt to attract the levels of manpower that were planned for the Montgomery Point Project. Any Joint Venture employee relocating in excess of 50 miles was eligible for $250 relocation pay, after conditions of employment were met.

In addition to increased wages and relocation pay, the Joint Venture instituted insurance benefits that were not anticipated at bid time in an effort to achieve the scheduled levels of manpower. All Joint Venture craft employees were eligible for optional health, accident and life insurance. The optional health insurance was available through Great Western at the cost of $26.00 for an employee, $69.00 for an employee and one dependant or $102.00 for an employee and two or more dependants.

The Joint Venture also provided vacation and holiday pay through the "Blue Horse" program that was not planned at bid time. Upon completion of 6 months service, Joint Venture employees began accruing hours in an "hour bank account." When an employees "hour bank account" reached 1,000 hours, the employee received a "vacation pay" check for 20 hours pay. A Joint Venture employee who left the Montgomery Point Project in "good stead" received a check for accrued vacation pay. Additionally, 8 hours straight time was paid to all Blue Horse members on the following

holidays: New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas Day. All Blue Horse employees were paid time and one half if required to work on any of the listed holidays. The employee had to be available for the day before and after the holiday. Based on information and belief, the following Blue Horse vacation payments were made: (1) Year 2000 - $12,805.00; (2) 2001 - $61,244.00; (3) 2002 - $97,620.00; and (4) 2003 (through August) - $61,820.25.

The Joint Venture also provided travel pay as an incentive to hire more qualified labor. The Joint Venture anticipated recruiting labor from surrounding states and included ½-hour boat travel time for each man-day. By including boat travel time, the Joint Venture compensated all employees from outside of Arkansas who had to be transported from Rosedale, Mississippi, across the Mississippi River, to the jobsite.

The Joint Venture also provided a per diem that was not anticipated at bid time. The Joint Venture initially provided a per diem of $20.00 per day to crane operators and pile drivers based on a five day week. The Joint Venture then expanded the per diem program so that $20/day per diem was paid to skilled crafts recruited 100+ miles from the Montgomery Point Project jobsite. The per diem was further extended by the Joint Venture to cover six days per week. According to Project records, the following per diem was paid: (1) Laborer, Year 2000 - $6,640.00, 2001 - $30,080.00; (2) Carpenter, 2000 - $22,280.00, 2001 - $127,920.00; (3) Operator, 2000 - $36,110.00, 2001 - $83,370.00; (4) Ironworker, 2000 – 24,260.00, 2001 - $30,480.00; (5) Finisher, 2000 - $7,980.00, 2001 - $39,290.00; and (6) Total, 2000 - $97,270.00, 2001 - $314,410.00.

The Joint Venture also provided more overtime in another effort to achieve sufficient manpower. Based on information and belief, the following overtime was paid:

(1) Laborers, Year 2000 - $129,755.30, 2001 - $467,937.56; (2) Carpenters, 2000 - $128,948.03, 2001 - $643,476.00; (3) Piledrivers, 2000 - $111,645.75, 2001 – $103,294.96; (4) Operators, 2000 - $208,950.53, 2001 - $487,488.51; (5) Electricians, 2000 - $14,232.00, 2001 - $7,299.75; (6) Ironworkers, 2000 - $63,537.02, 2001 - $186,049.95; (7) Truck Drivers, 2000 - $19,084.50, 2001 - $59,017.24; (8) Finishers, 2000 - $13,478.03, 2001 - $141,515.01; (9) Totals, 2000 - $689,631.16, 2001 - $2,096,078.98.

After recognizing it was clearly experiencing a labor shortage, the Joint Venture, in desperation for more labor, hired the professional recruiting firm Labor Finders in 2001, 2002 and 2003. However, the Joint Venture was forced to pay a significant premium for employees located by Labor Finders: Labor Finders billed the Joint Venture $31.95 per manhour but paid the employees $16.00 to $17.00 plus the cost of workmen's compensation insurance, general liability insurance and federal and state taxes, resulting in a significant net profit to Labor Finders.

The Joint Venture undertook continuous advertising in neighboring states through newspapers and advertisements in trade magazines. The Joint Venture also advertised in cities and towns including Monroe, Louisiana, Vicksburg, Mississippi and Pine Bluff, Arkansas. Advertisements were run for engineers, pile drivers and heavy equipment operators in publications and newspapers such as "RADA Advertising," "Industrial Projects" and the "Arkansas Democrat-Gazette."

All such Joint Venture efforts were similar to the recruiting efforts the Pine Bluff Project undertook for which Raytheon was compensated through the Pine Bluff Modification. The Montgomery Point Project had to undertake these actions to avoid

default termination and in order so that the Project could be completed without enormous liquidated damages and extended overhead costs.

## III. Legal Theory

The Corps' actions in favoring the Pine Bluff Project over the Montgomery Point Project by lavishing money on Pine Bluff so it could remedy its labor shortage is a breach of the superior knowledge doctrine, the Government's duty of good faith and fair dealing and constitutes a constructive change. This section will review these three labor theories and apply the present facts.

### A. Superior Knowledge Doctrine

#### 1. Superior Knowledge Doctrine: Helene Curtis and Am. Ship. Bldg. Co.

The U.S. Court of Federal Claims has historically recognized that Government liability exists or arises under the superior knowledge doctrine. Helene Curtis Indus. Inc. v. United States, 312 F.2d 774, 778 (Ct.Cl. 1963); American Ship Bldg. Co. v. United States, 654 F.2d 75, 79 (Ct.Cl. 1981).

In Helene Curtis, the leading case on the superior knowledge doctrine, a contractor agreed to supply large quantities of a disinfectant chlorine powder to the Army. Id. at 775. During production of the powder, the contractor had to undergo considerable study to learn that simple mixing would not produce the required powder product, but, instead, the ingredients had to be ground. Id. at 776. The contractor brought a claim against the Army alleging, among other things, that the Government had knowledge of a working mix procedure that required grinding and failed to disclose this information to the contractor. Id. at 777.

Before creating the superior knowledge doctrine, the court first stated the relevant facts at the time the contractor entered the contract with the Army:

> (i) the Army knew that grinding (which is more troublesome and costly than mixing) would in all probability be necessary, not because the specification required that process but because the end-product could not in fact be made without it; (ii) on the basis of that data it had or should be expected to obtain, plaintiff reasonably expected that the job could be done by simple mixing, without grinding; (iii) the Army was aware that plaintiff (and most of the other bidders) expected to produce the disinfectant without grinding; (iv) the contract specification did not inform or alert plaintiff as to the probable need for grinding; and (v) the Army did not otherwise inform plaintiff of this fact.

Id.

Based on these facts, the court then turned to whether the "conduct on the part of the Government amounted to a breach of contract." Id. The court first started with the general rule that the Government has no duty to disclose information but added an important caveat: "Where the Government has made no misrepresentations, has no duty to disclose information, and does not improperly interfere with performance, the fixed-price contractor of course bears the burden of unanticipated increases in cost . . . but that does not excuse the (Government) from liability if it breaches an independent duty to reveal data or if the end-product specification embodies a material misrepresentation misleading the contractor." Id. at 777-78 (citation omitted).

In developing the superior knowledge doctrine, the court emphasized two factors: "This is a case in which we have, in connection with the grinding of the chlormelamine, both a failure of the Government to tell what it should and a Government specification which in its context was actively misleading." Id. at 778. After cataloguing the unique

knowledge that the Government withheld from the contractor, the court held the Government liable based on the duty to share information:

> In this situation the Government, possessing vital information which it was aware the bidders needed but would not have, could not properly let them flounder on their own. Although it is not a fiduciary toward its contractors, the Government, where the balance of knowledge is so clearly on its side, can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word."

Id. (emphasis added). It is from this principle that the superior knowledge doctrine arose.

The Court of Federal Claims built upon Helene Curtis by later establishing four key elements to prove a claim under the superior knowledge doctrine. In American Ship Bldg. Co., the contractor brought a superior knowledge claim based on the Government's failure to disclose knowledge of delays and cost overruns that occurred in previous contracts prior to the award of the contractor's contract. American Ship Bldg. Co., 654 F.2d at 76-77. To evaluate the contractor's superior knowledge claim, the court clearly stated four elements to prove breach of the superior knowledge doctrine:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration;
> (2) the Government was aware the contractor had no knowledge of and had no reason to obtain such information;
> (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and
> (4) the Government failed to provide the relevant information.

Id. at 79.

In holding that the contractor was entitled to no relief under the superior knowledge doctrine, the court emphasized that "there was no issue of defective or

misleading specifications" and "there was no withholding of a vital fact affecting performance which the government knew plaintiff was unaware of." Id. at 79 (emphasis added). The court concluded it could not determine which fact the Government should have disclosed to the contractor. Id.

**2. Superior Knowledge Applied to Government Caused Labor Shortages**

The Defendant will most likely argue that the superior knowledge doctrine was created to address pre-bid vital information withheld from the contractor by the Government and will rely on J.A. Jones Constr. Co. and Bateson-Stolte, Inc. No case law has ever explicitly disclaimed post-bid knowledge as grounds for a superior knowledge claim, and, in fact, the GSBCA has recognized the Government may be liable for post-bid superior knowledge as to the cause of a contractor's labor shortage. Carolina Sec. Patrol, Inc., GSBCA No. 5602, 81-1 BCA ¶15040.

In Carolina Sec. Patrol, a contractor brought a claim arising out of a contract with the General Services Administration ("GSA") for protection and patrol services at the IRS Center in Memphis, Tennessee. Id. at 74,416. After being awarded the contract, the contractor encountered difficulties hiring the previously employed security personnel that worked at the Center and, as a result, the Government delayed the contractor's start-up date to November 1, 1979. Id. at 74,417. On October 19, 1979, a contracting officer's representative ("COR") for the GSA visited the IRS center and was "informed that a statement signed by some prospective employees of [the contractor] was being circulated at the [IRS] Center which stated that the signatories [guards] were not willing to work for the contractor." Id. That same day, the COR presented a copy of the statement to the contractor and pointed out that six signatories were included in

contractor's schedule for full-time guard duty. When the contractor failed to immediately identify six additional commissioned guards who could replace the six signatories, the contract was terminated for default. Id. at 74,418. The contractor brought a claim against the GSA, in part, because "the Government had a duty to apprise the contractor of the petition because of its superior knowledge . . . ." Id.

In assessing the contractor's superior knowledge claim, the Board never questioned whether post-bid knowledge could constitute vital information. Instead, the Board analyzed whether the post-bid knowledge, in this instance, was in fact vital information.

> Even assuming (the contracting officer's representative) had heard of the petition prior to October 19, 1979, the balance of knowledge is not so superior on the part of the Government as to impose a duty to reveal such knowledge to appellant. Mere knwolege (sic) of a rumor a few days before the start-up requirements of the contract were to be met, assuming that such is the case, does not constitute contribution on the part of the Government to the failure of the employees of the antecedent employer to join the new contractor.

Id. at 74,419 (emphasis added). Thus, the Board accepted that post-bid information could result in a valid superior knowledge claim, but, in this instance, the post-bid knowledge was "not so superior" so as to impose a duty to disclose. Id.

While the GSBCA failed to find a valid superior knowledge claim in Carolina Sec. Patrol, the Court of Federal Claims has applied the superior knowledge doctrine to hold the Government responsible for not disclosing detrimental labor conditions created by the Government. J.A. Jones Constr. Co. v. United States, 390 F.2d 886, 888 (Ct. Cl. 1968). In J.A. Jones Constr., the contractor originally agreed to build facilities for the Army Corps of Engineers ("Corps"), acting as the construction agency for the

Department of the Air Force, at an Air Force Missile Test Center. Id. at 886. The Air Force then subsequently entered into twenty-eight contracts, aggregating $55 million, with other contractors for work on the Air Force's Inter Continental Ballistic Missile system (the "ICBM system") located in the same locale as the original contract. Id. The contractor's claim was for recovery of overtime wages the contractor paid as the result of the labor shortage created by the Air Force's other subsequent and previously undisclosed contracts on the ICBM system. Id. at 887.

In reviewing the Contractor's claim, the court first described the superior knowledge doctrine:

> (W)hile the [Government] had no obligation to prevent (and, indeed, was free to precipitate) the avalanche that buried the contractor, it was not free, if it was aware of the impending avalanche and knew that [the contractor] was not, to stand aside and let the bidder be overwhelmed without a warning. . . . The only real issue is whether the defendant – in the form of some agency of the Federal Government accountable to [the contractor] – did have such knowledge and therefore such a duty [to disclose].

Id. at 888 (citing to Helene Curtis, 312 F.2d at 777-78; Beuttas, 324 U.S. at 772-73; Bateson-Stolte, 172 F.Supp. at 456-57).

The court then established Government liability through the nondisclosure doctrine: (1) the contractor did not know, nor should it have known, of the subsequent contracts; (2) the Air Force knew of the ICBM Projects and its probable consequences at the time the contractor's contract was awarded; (3) the Air Force knew or should have known of the contractor's ignorance as to the subsequent ICBM Project contracts but nevertheless failed to disclose the information. Id. at 890. The court then remanded

to the ASBCA for the contractor to show that the Air Force's nondisclosure misled the contractor and caused additional labor expenditures. Id. at 893.

In Bateson-Stolte, the contractor sought recovery for increased wages it paid due to labor competition with another Government project. Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454 (Ct. Cl. 1959). In preparing its bid for the Corps, the contractor considered local labor costs and supply, and used prevailing wage rates in the area. Id. at 455. The Atomic Energy Commission (the "AEC") contracted for a separate major project in the same area as the Corps' project one week after the contractor signed its contract with the Corps. Id. The AEC knew that its project would substantially affect the labor supply and wage rates in the area. Id. The AEC then determined the area's prevailing wage rates (i.e. the contractor's bid rates) would not draw adequate labor supply and utilized much higher wage rates from cities located 150 miles from the project. Id. at 455-56. Initially, due to a Government enforced wage freeze, the contractor was forced to offer overtime to maintain its labor force and compete with the AEC project. When the wage freeze was lifted, the contractor increased wages to match the AEC project. Id. at 456.

Before reviewing specific elements, the court explained the principle of the superior knowledge doctrine and how this doctrine should be applied to a Government-caused wage increase:

> If the [Government] knew it was going to do a thing which of necessity would require the [the contractor] to pay a wage greater than that prevailing in the community in which its work was to be done, and the [the contractor] was ignorant of this fact, it would seem that good faith required the [Government] to apprise the [contractor] thereof. If [the Government] caused the increase in the wages [the contractor] had to pay, [the Government] is liable for the

> increase. It seems hardly necessary to cite authority for this statement, but this is the clear implication of the decision of the Supreme Court in United States v. Buettas . . . .

Bateson-Stolte, 172 F.Supp. at 456-57. (citing to Beuttas, 324 U.S. 768, 772 (1945) ("[S]ome of the judges below resorted to the principle that it is an implied condition of every contract that neither party will hinder the other in his discharge of the obligations imposed upon him, nor increase his cost of performance. They held that by inviting bids for the superstructure at minimum wages higher than those fixed in the respondents' contract for the foundations the petitioner breached this implied condition. But, of course, this can be true only if the Government caused the increase in wages. . . . There is no finding that petitioner's officers or agents had reason to expect that the fixing of a wage rate under another contract for a separate portion of the work, which was to be commenced after completion of respondents' contract, would cause a breach of their existing wage agreement by respondents' employees")).

In applying the nondisclosure doctrine, the court emphasized that liability would be affected if the contractor had knowledge, or should have had knowledge, of the impending AEC project and the labor force to be employed. Id. Additionally, the court focused on the specific Government agency that possessed the knowledge: "If it had been the [AEC] that had dealt with the [contractor], it would have been [AEC's] duty to disclose to the [contractor] that [AEC] was going to use this very large labor force on this other project." Id. The court then held that the "[Government] should be held liable only if the [Corps] had knowledge of the impending employment of this huge labor force [by the AEC]." Id. The court remanded for determination of what knowledge the Corps and the contractor possessed about the AEC project. Id. at 458.

### 3. The Pine Bluff Modification Constitutes Superior Knowledge that the Corps Failed to Disclose to the Joint Venture

Based on the principle of Helene Curtis, the Corps is liable for the labor shortage at Montgomery Point, under the superior knowledge doctrine, because the balance of knowledge of the Pine Bluff Modification was clearly with the Corps, yet by silence, the Corps betrayed the Joint Venture and forced the Contractor to incur huge cost overruns to cope with the labor conditions encountered at Montgomery Point. As articulated in American Ship Bldg Co. and further developed in J.A. Jones Constr. Co. and Bateson-Stolte, there are four elements that must be proved to show the Corps breached the superior knowledge doctrine by issuing the Pine Bluff Modification:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration;
>
> (2) the Government was aware the contractor had no knowledge of and had no reason to obtain such information;
>
> (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and
>
> (4) the Government failed to provide the relevant information.

#### a. The Joint Venture Performed Without Vital Knowledge

The Joint Venture undertook to perform the Montgomery Point Project without the knowledge that (i) a Pine Bluff Modification would be issued, and (ii) the Modification would have a major effect on performance costs and duration. The Pine Bluff Modification was issued on May 19, 2000, but the Joint Venture did not learn of the extent of the Pine Bluff Modification until February 2002, when it received some information regarding the Modification from one of its subcontractors, Plateau Electric.

Thereafter, on April 15, 2002, the Joint Venture received a full copy of the REA Part B from John R. Herrig, attorney for Morrison Construction Services, Inc.

The Pine Bluff Modification also constituted "vital knowledge" to the Joint Venture because the Modification increased performance costs and extended the overhead for the Montgomery Point Project. As the court explained in Bateson-Stolte, the Corps was required to fully disclose to the Joint Venture any act which of necessity would require the Joint Venture to pay higher wages. The Modification not only required the Joint Venture to pay higher wages to try and attract urgently needed labor, but the Joint Venture also paid per diem, relocation pay, insurance benefits, vacation pay, travel pay, overtime to increase weekly wages and also hired professional recruiters. Furthermore, the Corps-created labor shortage caused the Joint Venture to experience delays and loss of productivity during its performance of the Montgomery Point Project.

**b. The Corps Was Aware the Joint Venture Had No Knowledge of the Modification**

The Corps was aware the Joint Venture had no reason to know of or learn of the full scope and impact of the Pine Bluff Modification. The Modification modified the contract between the Corps and Raytheon at a separate project independent of the Joint Venture. Additionally, the Corps had control of the information regarding the Pine Bluff Modification and chose not to disclose. As a result, the scope of the Modification was not known to the Joint Venture until the Joint Venture was notified by its subcontractor during February 2002. In conjunction with its bid preparation and prior to the issuance of the Pine Bluff Modification, the Joint Venture properly and reasonably evaluated labor costs and conditions in the area, as required by Contract clause 52.236-3, utilizing, to some extent, the J.A. Jones work at the Arkansas Hydropower Project.

The Pine Bluff Modification and the resulting Montgomery Point labor shortage occurred after the Contract was issued and these conditions were not ascertainable when the Joint Venture prepared its Bid or even after the Modification was issued.

**c. <u>The Corps' Specification Misled the Joint Venture</u>**

The Contract Specification regarding labor conditions supplied by the Corps misled the Joint Venture and did not put the Joint Venture on notice to inquire as to the Pine Bluff Modification. As previously described, the Montgomery Point Contract assigned certain duties to the Joint Venture related to labor conditions:

> 52.236-3 Site Investigation and Conditions Affecting the Work
>
> (a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to . . . (2) the availability of labor . . . .

Based on this Specification, the Joint Venture took affirmative steps to ascertain the availability of labor at the Montgomery Point Project prior to bid. Specification 52.236-3 misled the Joint Venture because the Joint Venture continued to rely on its pre-bid labor estimates throughout the Project and the Joint Venture was not put on notice by the Specification that it needed to inquire as to potential changed labor conditions, and, more specifically, a Corps-issued Modification at any other Corps project that significantly impacted labor conditions.

**d. <u>The Corps failed to Provide Information as to the Modification</u>**

Finally, the Corps failed to provide timely, full disclosure of the Pine Bluff Modification to the Joint Venture. The Joint Venture learned of the Modification in

February 2002 from its subcontractor. The Corps never provided relevant information regarding the Modification and the impact it would have on the Montgomery Point Project.

**B. Duty of Good Faith and Fair Dealing**

The duty of good faith and fair dealing includes a duty not to prevent, hinder or unreasonably delay the contractor's performance. Under the duty not to hinder, the Government may not contribute to a contractor's labor shortage. The Corps' Pine Bluff Modification breached the Corps' duty not to hinder the performance of the Joint Venture as it created a labor shortage at the Montgomery Point Project that caused substantial costs and delay to the Joint Venture.

**1. Duty Not to Hinder**

Every government contract contains an implied obligation that neither party will do anything to hinder, delay, or prevent performance of the contract. Tecom v. United States, 66 Fed. Cl. 736, 769-70 (2005), Manuel Bros. v. United States, 55 Fed. Cl. 8, 38 (2002) (citing to Lewis-Nicholson v. United States, 213 Ct. Cl.192, 204, 550 F.2d 26, 32 (1977)).

A contractor must satisfy two elements to prove government liability for a breach of the duty not to hinder contract performance:

(1) the cause of the delay was the fault of the government, and

(2) the delay must be of sufficient magnitude and the delay must be of a sufficient hindrance to the operations of the contractor to constitute a breach. Manuel Bros., 55 Fed. Cl. at 38-39.

The Government breaches its duty not to hinder when it interferes with the contractor's performance in a manner that is unreasonable under the circumstances. Tecom, 66 Fed. Cl. at 770.

**2. The Bannercraft Exception**

The Government may act unreasonably and breach its duty not to hinder contract performance when it interferes with the contractor's usual labor practices:

> [T]he duty imposed by law upon the Government not to hinder performance by the contractor is no greater than that of not disturbing or interfering with the usual labor practices of the industry which were within the contemplation of the parties when the contracts were entered into and concerning which the Government was charged with knowledge . . . .

T.C. Bateson Constr. Co., ASBCA No. 5492, 60-1 BCA ¶2552, at 12,352 (emphasis added).

The Armed Services Board, in Bannercraft Clothing, created an exception to the general rule that a Contractor is responsible for its labor force. ASBCA No. 6247, 1963 BCA ¶3995, 19,736. In Bannercraft Clothing, the contractor agreed to manufacture coats for the Government and initially encountered no labor problems. Id. at 19,731. The contractor's competitor was then awarded a "set-aside" from the same contract and began manufacturing a significant quantity of similar coats. Id. As a result, the contractor suffered from a labor shortage because the contractor's competitor was in a better position to hire local employees to manufacture coats. Id. at 19,731-32. Additionally, the Government aggravated the labor shortage by improperly removing its inspector from the contractor's jobsite during a dispute, resulting in a shutdown of the project and the loss of many of the contractor's employees. Id. at 19,733-34.

Based on these facts, the Board explained that generally the contractor assumes the risks of the labor supply but there is a limit to this assumption of risk:

> The evidence adduced in this case bears out the Government inspector's findings that but for the siphoning off of the [employees] by the contractor's competitors, the contractor would have been on schedule. This contractor left no stone unturned in its efforts to overcome its labor problems. . . . Once the contractor overcame its labor difficulties, which incidentially [sic] were sorely aggravated by the improper removal of the Government inspector from the contractor's [project], it developed a satisfactory performance rate and did a creditable [sic] job on the unterminated portion of the contract.

Id. at 19,735-36. Since the contractor's competitor caused the labor shortage through a Government awarded contract, and the Government exacerbated the labor shortage through its own actions, the contractor's performance delays were excusable. Id. at 19,736.

The Bannercraft exception was further developed in later Armed Services Board decisions. In Robert McMullan, the Board explained that the Bannercraft exception applies "where [the] labor shortage was caused by the Government." 68-1 BCA ¶7068, at 32,678 (refusing to apply the Bannercraft exception as no evidence was presented that the contractor's labor shortage was caused by the Government). The Board recently applied the Bannercraft exception in NTC Group, Inc.. ASBCA No. 53720, 04-2 BCA ¶32706. In NTC Group, the contractor suffered from a labor shortage after entering into a contract with the Government that required the use of certified lab technicians. Id. at 161,810-11. The contractor was unable to hire a sufficient number of certified lab technicians because the Government refused to provide contact information

for these individuals and the laboratory chiefs deterred technicians from working for the contractor. Id.

The Board first described exceptions to the general labor rule: "[W]e will not allow excusable delay from a labor problem other than a strike except in the most unusual circumstance as where the Government also contributed to the delay (Bannercraft), or where abnormal circumstances exist which could not have been anticipated (Hydro Fitting)." Id. at 161,810 (emphasis added). The Board then found the Government contributed to the contractor's labor shortage by refusing to share the names of certified lab technicians. Id. at 161,811.

The U.S. Court of Federal Claim has also recognized that government-caused labor delays are insufficient to establish a breach where the Government reasonably attempted to mitigate the delays that hindered the contractor's performance. Summit Contractors v. United States, 23 Cl. Ct. 333, 336 (1991). In Summit Contractors, the contractor claimed that the Government hindered its ability to remove timber when the Government contracted with another party to perform work on the access roads to the timber area. Id. Because the Government informed the contractor of the potential delays prior to award, the court determined that the Government "made a reasonable effort to mitigate potential difficulties in contract performance" and the interference did not amount to a breach. Id.; See also Manuel Bros., 55 Fed. Cl. at 40-41 (holding that delay caused by Government's failure to provide sufficient escorts for laborers was not unreasonable because contract advised contractor to expect delays associated with escorts).

### 3. **The Bannercraft Exception Applies to the Corps-Caused Labor Shortage**

Clearly, the Bannercraft exception should be applied because the Corps' Pine Bluff Modification contributed approximately $23 million to Raytheon so that it could offer a more lucrative wage and benefit package to obtain labor from other contractors in the area. Unfortunately, for the Joint Venture, the Pine Bluff Modification worked as Raytheon was able to attract the labor force needed, but Raytheon's Modification caused a serious labor shortage at Montgomery Point. As explained by the Armed Services Board in Bannercraft Clothing, Robert McMullan, and NTC Group, an exception to the general labor rule applies where the Government caused or contributed to a contractor's labor shortage. In actuality, the Corps went beyond contributing to the labor shortage – the Corps caused it by issuing the Pine Bluff Modification.

As previously discussed, when Pine Bluff began benefiting from the Pine Bluff Modification in June 2000, the first indications of the concurrent Montgomery Point labor shortage occurred. After the Modification, Raytheon hired a disproportionate share of traveler employees and Arkansas employees, many of whom would have worked at the Montgomery Point Project but for the increase in wages, per diems, travel allowances and overtime from the $23 million Pine Bluff Modification. Montgomery Point experienced a severe labor shortage, resulting in decreased hiring despite the Project's need for more employees during concrete placement operations. The Corps must have been aware of the impact the Modification would have on Montgomery Point, as it was a Corps project only 58 miles away and the second largest project in the state of Arkansas. In fact, the sole intent of the Modification was to "match the labor packages offered by other contractors in the area to get the labor" from these other contractors,

including the Joint Venture. The Corps' clear favoritism of Pine Bluff over Montgomery Point (probably for political reasons) highlights its interference with the Joint Venture's labor practices.

### C. Constructive Change

A constructive change occurs when "the Government either expressly or impliedly order[s] work outside the scope of the contract, or if the Government otherwise cause[s] the contractor to incur additional work." CEMS v. United States, 59 Fed. Cl. 168, 203 (2003). To establish that an action by the Government resulted in a constructive change to the contract, a contractor must establish that it performed work "in addition to or different from that required under the contract . . . by express or implied direction of the Government or by Government fault." Id. (emphasis added)

Furthermore, the Armed Services Board has long held that Government fault may be established in a constructive change claim through a breach of an implied warranty. Johnson & Son Erectors, ASBCA No. 24564, 81-1 BCA ¶15082, at 74,601; See also J.A. Jones Constr. Co., ASBCA No. 43344, 96-2 BCA ¶28517, at 142,420 (stating, "in Government contract practice, breach of the duty of good faith performance is often manifested by the Government's violation of its implied duty not to hinder or interfere with the contractor's performance. . . . Such interference may be treated as a breach or a constructive change . . . .'"). Thus, the implied duty not to hinder the performance of another party is redressable through a constructive change. Id. at 74,603.

The Corps' issuance of the Pine Bluff Modification constitutes Government fault because the Government breached its duty not to interfere with the contractor's

performance. Under the Bannercraft exception, if the Government causes or contributes to a contractor's labor shortage, the Government has breached its duty not to interfere with the contractor's performance. The Pine Bluff Modification created a labor shortage at Montgomery Point by subsidizing Raytheon so that it could raise its labor wages and benefit package, and more effectively hire traveler employees and Arkansas employees, to the detriment of the Montgomery Point Project.

Based on the Corps' breach of its implied duty not to interfere, the Joint Venture is permitted recovery for a constructive change through the Changes Clause. Under § 52.243-4(a)(4) of the Changes Clause, the Corps was permitted to make changes in the work, including "the method or manner of performance." The Corps made a change in the method and manner of the Joint Venture's performance when it issued the Pine Bluff Modification, causing a labor shortage at Montgomery Point. Further, § 52.243-4(d) stipulates that the Contracting Officer, through an equitable adjustment, shall remedy any increase in cost to the Joint Venture resulting from the change. Accordingly, under the Changes Clause, the Joint Venture should recover all costs associated with the Corps-created labor shortage at Montgomery Point.

## IV. Conclusion

At the request of the Government's attorneys at the status conference with the Court on July 21, 2008, the Court ordered the Plaintiffs to submit a Statement of Claim outlining the underlying facts and legal theories and authorities for the labor shortage claim. As discussed herein, Plaintiffs have shown entitlement to their labor shortage claim either under superior knowledge, breach of the duty of good faith and fair dealing or constructive change. The underlying facts demonstrate that the Corps, by issuing a

substantial contract modification to a nearby project to increase its labor force, caused a significant and detrimental labor shortage at the Montgomery Point Project at the precise moment the Joint Venture needed to ramp-up its workforce for the commencement of concrete operations.

Plaintiffs' claim for the Corps' interference with its labor force is a cognizable claim under established legal principles.

Respectfully submitted this 5th day of August 2008.

Robert G. Watt, Esquire
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 Phone
(703) 893-8029 Facsimile
rwatt@wthf.com

Attorneys for Plaintiffs

Of Counsel:

Keith C. Phillips, Esquire
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 Phone
(703) 893-8029 Facsimile
kphillip@wthf.com