No. 04-1692C
(Judge Christine Miller)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FIREMAN'S FUND INSURANCE COMPANY, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT DESCRIBING THE PURPORTED "LABOR SHORTAGE" CLAIM

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, JR.
Assistant Director

JAMES W. POIRIER
Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0856
Facsimile: (202) 514-7969

Attorneys for Defendant

August 12, 2008

## TABLE OF CONTENTS


PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT DESCRIBING THE PURPORTED "LABOR SHORTAGE" CLAIM . . . . . . . . . 1

I. Summary Of The Response . . . . . . . . . . . . . . . . . 1

II. The Evolving Labor Claim . . . . . . . . . . . . . . . . 6

III. No Plausible Offer To Prove Any Labor Shortage . . . 9

A. The Summary Exhibit Is Limited To October 2000 Through May 2001 . . . . . . . . 11

B. The Summary Does Not Demonstrate A Causal Relationship . . . . . . . . . . . . . . . . . 12

C. The Summary Does Not Support Consequential Damages . . . . . . . . . . . . . . . . . . . 15

D. Raytheon's Advocacy Is Not Evidence . . . . . . 15

IV. Fireman Has Made No Plausible Offer Of Proof That One Modification To The Pine Bluff Contract Caused A Labor Shortage Of All Construction Workers In An Eight-State Region . . . . . . . . . . . . . . . . 16

A. The Start Of The Pine Bluff Work Was Delayed . . . . . . . . . . . . . . . . . . . 17

B. Fireman Fails To Measure The Eight-State Labor Market . . . . . . . . . . . . . . . . . . 19

C. Fireman Fails To Offer To Prove Any Significant Competition For Labor From Pine Bluff . . . . . . . . . . . . . . . . 21

V. Fireman Offers No Legal Authority . . . . . . . . . . 25

A. Fireman Has Abandoned Its Superior Knowledge Claim . . . . . . . . . . . . . . . . 25

1. Pre-Award Superior Knowledge No Longer Alleged . . . . . . . . . . . . . . . . . . 26

2. Modification 41 Superior Knowledge Not Alleged . . . . . . . . . . . . . . . . 26

B. Fireman's Alleged "Early Warning" Right Has No Basis . . . . . . . . . . . . . . . . . . 28

C. Fireman Has Not Alleged Any Purposeful Interference . . . . . . . . . . . . . . . . . 30

D. Fireman Has Not Alleged Any Constructive Change . . . . . . . . . . . . . . . . . . . . 30

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**TABLE OF AUTHORITIES**


| CASES | PAGE(S) |
|---|---|
| Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454 (Ct. Cl. 1959) . . . . . . . . . . . . . . | 29 |
| Horowitz v. United States, 267 U.S. 458 (1925) . . . . . . . . . . . . . . . . . . . . . . | 25, 30 |

INDEX TO APPENDIX


Letter, from Mr. Poirier to Mr. Watt, dated July 28, 2008 . . . . . 1

Fireman's response to interrogatory no. 7, verified August 8, 2008 . . . . . 5

Declaration of Tracy Wallace, Regional Manager of JAF, Inc., dated August 8, 2008 . . . . . 10

Commerce Business Daily, dated June 24, 1994 . . . . . 14

Memorandum to Chemical Demilitarization Branch, identifying the Pine Bluff Bidder Mailing List, dated November 29, 1994 . . . . . 16

Internet copy of Commerce Business Daily, dated July 25, 1997 . . . . . 32

Modification 69 to Pine Bluff contract, dated February 15, 2000 . . . . . 33

Price Negotiation Memorandum for modification 69, dated February 18, 2000 . . . . . 35

Modification 89 to Pine Bluff contract, dated May 15, 2000 . . . . . 42

Price Negotiation Memorandum for modification 89, undated . . . . . 48

Modification 209 to Pine Bluff contract, dated November 13, 2001 . . . . . 58

Draft summary of Fireman database, dated August 11, 2008 . . . . . 74

Defendant's first set of requests for admissions, (including attached modification 41 to the Montgomery Point contract), dated July 25, 2008 . . . . . 75

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIREMAN'S FUND INSURANCE COMPANY, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 04-1692C |
| THE UNITED STATES, | ) | (Judge Christine Miller) |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT DESCRIBING THE PURPORTED "LABOR SHORTAGE" CLAIM

Defendant, the United States, respectfully responds to "Plaintiffs' Statement Of Claim," filed by plaintiffs, Fireman's Fund Insurance Company, American Home Assurance Company, Fidelity and Deposit Company of Maryland, J.A. Jones Construction Company and Guy F. Atkinson Construction Company, a Joint Venture (the "joint venture"), and Universal Underwriters Insurance Company (collectively, "Fireman") on August 5, 2008 ("Fireman Statement").

### I. Summary Of The Response

Earlier this year, seeking a more detailed understanding of the allegations set forth in the amended complaint, we reviewed the revised claim sent to the contracting officer by Fireman. Subsequently, we examined many documents from the files of the joint venture. After these investigations, we contacted counsel for Fireman and requested some evidence from contemporaneous

documents to support the alleged "labor shortage."[1] We had found no evidence of a labor shortage.

At the hearing on July 21, 2008, we repeated our concerns to the Court, and a briefing schedule was established for Fireman to make an offer to prove some labor shortage. Fireman has failed to do so.

In general, the Fireman Statement has three significant flaws:

1. no plausible offer to prove that any labor shortage ever existed at the Montgomery Point dam;

2. no plausible offer to prove its allegation that modification 89 to the Pine Bluff contract[2] created a labor shortage for all construction workers in an eight-state labor market; and

3. no plausible legal basis for liability.

We address each of these topics below.

---

[1] The amended complaint refers to a "labor shortage" at least 19 times, but the phrase is never defined. We assume that a labor shortage means that, at some point in time, the joint venture sought to hire a person or persons with some skill, and the joint venture was unable to do so, despite reasonable efforts.

[2] "Pine Bluff contract" refers to contract no. DAAA09-97-0098 between Raytheon Demilitarization Company ("Raytheon") and the United States, as amended.

Before addressing the merits of Fireman's offer of proof, we wish to make a further report about Fireman's methodology.

Fireman's offer of proof is largely an offer to demonstrate certain facts by analyzing certain payroll records from Pine Bluff and Montgomery Point. Although we have asked, we have not yet seen any support for the summary exhibits and miscellaneous statistics that Fireman relies upon in its offer of proof.

It has not been necessary to see the supporting data in order to refute Fireman's offer of proof. The categories employed, and the logic of the arguments, are so obviously flawed that the Fireman Fund offer can be discredited even assuming for the sake of argument that the data is correct.

More troubling to us, it appears that Fireman has ignored most of the relevant information that it developed. We have used a database of payroll records provided to us by Fireman's previous counsel -- presumably the same, or nearly the same, database relied upon by Fireman -- and we have found specific information suggesting that the allegations in the complaint are wholly without merit.

For example, from time to time, Fireman has alleged that the Pine Bluff project drained employees from the Montgomery Point dam project. E.g., Amended Complaint, ¶ 61 ("Raytheon was successful in enticing craft labor away from the local labor

market, including the Montgomery Point Project.").[3] And yet, it appears that Fireman has neglected to test its hypothesis.

We compared the payroll data from the two projects, using databases provided to us by Fireman's counsel. In July, we sent Fireman proposed summary exhibits demonstrating that more carpenters and cement workers (the categories of workers that Fireman has previously alleged were most important to its alleged consequential damages) left the Pine Bluff project and went to work for the Montgomery Point dam than had left the dam project to work at Pine Bluff. *See* A1-4 (letter and proposed summary exhibits).[4]

In response, it now appears that Fireman is distancing itself from its earlier allegation:

> the impact of the Modification can not be determined through employees that went from Montgomery Point to Pine Bluff or vice-versa.

Fireman Statement, at 11.

In addition to making only selective inquiries with regard to information gathered (such as the payroll records), it appears that Fireman has made almost no inquiry directed toward actual events at the Montgomery Point site. For example, it appears that Fireman made no effort to contact the subcontractor, JAF,

---

[3] "Amended Complaint" refers to the amended complaint filed by Fireman in this action on January 8, 2007.

[4] "A" refers to the appendix to this response.

Inc. (dba Labor Finders), a temporary employee agency hired to help the joint venture find carpenters. This is an odd approach considering that carpenters are a category of workers that Fireman has expressly identified as having been both scarce and important to its damages.

JAF, Inc. was known to Fireman. In response to our interrogatory, Fireman identified the contract with JAF, Inc. as evidence that the joint venture had been required to take extraordinary efforts to address a labor shortage. A7,9 (Fireman's response to Interrogatory No. 7); see Amended Complaint, ¶¶ 77-78. And yet, it appears, Fireman never sought to interview any managers or employees of JAF, Inc. until we invited Fireman's counsel to join in our interview of Mr. Wallace, regional manager of JAF, Inc., on August 4, 2008.

Mr. Wallace disclosed that JAF, Inc. supplied carpenters with special experience to the joint venture during 2001-03. Mr. Wallace stated that a take-home wage of $16 or $17 per hour (plus time-and-a-half for overtime) was sufficient to entice specially-qualified carpenters throughout 2001 through 2003, but that many carpenters disliked the Montgomery Point dam job because the site was remote, the available local motels were few and in poor condition, and the mosquitos fiercely attacked workers on the night shift. Mr. Wallace further reported that many carpenters left the Montgomery Point dam for another

construction project -- the Greenville bridge project (contracted by the State of Mississippi for a bridge connecting Arkansas to Mississippi across the Mississippi River). Mr. Wallace, who has recruited construction workers for years, could not recall anyone ever suggesting that the Pine Bluff arsenal project had caused a labor shortage. A10-13 (declaration of Mr. Wallace).

Mr. Wallace's testimony is obviously very damaging to Fireman's case because it is at odds with Fireman's theory. However, we do not suggest that Fireman has been hiding JAF, Inc. Indeed, to our knowledge, Fireman had no way to know what Mr. Wallace would say.

What is most troubling to us about Mr. Wallace's testimony is that Fireman had no idea what he would say. In short, it does not appear to us that the "labor shortage" claim is based upon any reasonable investigation of the events at Montgomery Point. Instead, the "labor shortage" claim appears to be nothing more than a hypothesis -- one never tested by any reasonable inquiry. This is disappointing, and leads to a waste of resources by the Court and the parties.

In any event, the Fireman Statement fails to offer any credible evidence of any labor shortage.

II. <u>The Evolving Labor Claim</u>

The labor claim has changed somewhat over time.

In general, the original complaint, filed November 19, 2004 ("Complaint"), alleged that two modifications to the Pine Bluff contract (Modification 89 in May 2000, and Modification 209 in November 2001) disrupted the local market for carpenters and cement workers, increased labor costs, and caused consequential damages. In general, the amended complaint (filed in 2007) alleged that modification 89 to the Pine Bluff contract caused a "labor shortage" for <u>all construction workers</u> both in Arkansas and in surrounding states. The Fireman Statement specifically identifies a labor shortage <u>in an eight-state area</u>.

In the initial complaint, Fireman sought approximately $33.5 million, plus interest, costs and attorney fees upon the grounds that modifications to the Pine Bluff contract diverted labor from the joint venture's Montgomery Point dam project and so "caused significant delays, craft shortages, impacts, and cost overruns that are the Government's fault." Complaint, ¶ 47; <u>see</u> <u>id.</u> ¶ 33 ("This modification [modification 89, executed in May 2000] had the direct effect of recruiting labor away from the Montgomery Point Project, making labor more difficult and costly to recruit for Montgomery Point, and decreasing the usual labor attraction of a project like Montgomery Point."); ¶ 37 ("On November 2, 2001, after Raytheon had threatened to declare bankruptcy and to abandon the Pine Bluff Project, the Government authorized, with

virtually no substantiation, a $23 million modification [Modification 209] to Raytheon's contract.").

In the initial complaint, Fireman emphasized the alleged competition for carpenters and concrete finishers:

> The Pine Bluff Project required large quantities of the same skilled crafts, particularly carpenters and concrete finishers, that the Joint Venture needed for the work at Montgomery Point.

Id. at ¶ 24 (emphasis added). Fireman also emphasized the impact of the Pine Bluff modifications upon the local labor market. E.g., id. at ¶ 41 ("Raytheon was successful in enticing or directing labor away from other projects in the local market"); id. at ¶ 45 ("effect of these actions . . . was to drain the local market").

In the amended complaint, carpenters and concrete finishers are no longer specifically identified -- although the commencement of "major concrete placement efforts" at Montgomery Point in "mid-2000" is highlighted. Amended Complaint, ¶ 28; accord id. ¶ 60. Instead, Fireman emphasized a general "labor shortage." E.g., id. ¶ 58 ("As a result of the $22.5 million modification given to Raytheon on the Pine Bluff Project, the Corps solved Raytheon's labor shortage problem, but consequently created a labor shortage for Jones/Atkinson on the Montgomery Point Project.") (emphasis added).

The phrase "labor shortage" appears at least 19 times in the Amended Complaint. The phrase "labor shortage" does <u>not</u> appear in the initial complaint. The phrase "craft shortage" does appear in the initial complaint, but the alleged craft shortage is blamed upon disruptions associated with fly ash problems, as well as disruptions to the <u>local</u> labor market. Complaint, ¶ 46.

In the Fireman Statement, filed on August 5, 2008, Fireman alleges that modification 89 (May 2000) created a labor shortage in the general category of all construction workers in an eight-state labor market (Arkansas, Mississippi, Texas, Florida, Alabama, Tennessee and Oklahoma). <u>See</u> Fireman Statement, at 14-15.

III. <u>No Plausible Offer To Prove Any Labor Shortage</u>

In the Fireman Statement, Fireman alleges a stealth economic cataclysm:

> Jones/Atkinson, although clearly suffering through a labor shortage, was <u>unaware that the labor shortage had been created by the Corps</u> through its actions at Pine Bluff [modification 89, in May 2000] until approximately February 2002 . . .

Amended Complaint, ¶ 64 (emphasis added). While the amended complaint alleges that the joint venture knew all along that it was "suffering through a labor shortage," the Fireman Statement does <u>not</u> offer to present to the Court <u>any evidence</u> of an understanding that there was some specific labor shortage at some specific time.

The Fireman Statement cites no contemporaneous document from the files of the joint venture referencing a labor shortage. Furthermore, it does not offer to produce any witness who will testify concerning any specific labor shortage.

While Fireman appears to be disinterested in any direct evidence, our initial inquiries quickly uncovered direct evidence contradicting the Fireman thesis. Mr. Wallace, the manager at JAF, Inc. responsible for recruiting specially-skilled carpenters, provided us with the following sworn statement:

> During the entire period of contract performance, I do not recall that Ms. Fran Purvis, or anyone else, ever suggested to me that there was a labor shortage caused by a Federal project at the Pine Bluff arsenal.

All.

Rather than offer to produce contemporaneous records, or testimony, Fireman offers only its analysis of certain payroll records. The principal evidence of a labor shortage offered is a summary exhibit set forth on page 12 of the Fireman Statement.

The summary exhibit purports to show planned total "manpower" (total construction employees?) per month compared to actual total manpower per month. In related text, Fireman cites the chart, makes a vague admission, and then concludes that there was a "serious" labor shortage at some undefined point in time:

> Initially, when Montgomery Point entered its <u>most significant hiring period</u> starting in May of 2000, the Joint Venture essentially <u>was able to meet its labor plan</u>. As can be

> seen in the graph (below), after June 2000, the Montgomery Point Project began to experience a serious labor shortage.

Fireman Statement, at 11 (emphasis added).

Even assuming for the sake of argument that the summary is accurate,[5] the summary does not prove any labor shortage. At most, the summary exhibit suggests that there were fewer total joint venture employees than planned at Montgomery Point during a brief period (October 2000 through May 2001).

There could have been dozens of reasons contributing to a changed pattern of hiring in the months October 2000 through May 2001. It is simply not reasonable to conclude from the summary alone that there was a labor shortage. Furthermore, the summary's "proof" that the labor shortage existed <u>only</u> from October 2000 through May 2001 is contrary to Fireman's allegations of a persistent labor shortage.

A. The Summary Exhibit Is Limited <u>To October 2000 Through May 2001</u>

In the related text of the Fireman Statement, Fireman admits that it met its labor plan "when Montgomery Point entered its most significant hiring period starting in May 2000." <u>Id.</u> at 11.

---

[5] On July 24, 2008, we asked Fireman to provide the documents allegedly summarized on the chart. We have not yet received any response.

The admission appears to be supported by the summary exhibit. The number of total employees are shown at "planned" levels in June, August and September 2000. Id. at 12. The number of total employees are shown at above planned levels in May 2000, and below planned levels in July 2000. Id.

Vaguely, the Fireman Statement alleges that a "serious" labor shortage of total employees is demonstrated "after June 2000." Actually, the period when "average monthly manpower" is shown to be below planned average monthly manpower is the brief period during the winter of 2000-2001. Id. (October 2000 through May 2001). The summary exhibit shows labor levels at or above planned levels for every month after May 2001.

We doubt that Fireman planned to have its summary exhibit serve as an admission that there was no labor shortage after May 2001. However, if the summary presented any meaningful data categories, then it could be interpreted that way. Fortunately for Fireman, its summary is meaningless on its face.

B. The Summary Does Not Demonstrate A Causal Relationship

There are many obvious flaws in the summary exhibit.

First, it is impossible to evaluate the baseline "plan." Did the joint venture plan its activities with weather considerations in mind? It seems likely that a reasonable contractor planning to build a dam would do so. If so, do the months of the plan match the months when work took place?

Second, it is impossible to distill any meaning from the category, "average monthly manpower." Does it include all construction workers employed by the joint venture? Only construction workers employed by the joint venture? Does it include subcontractors?

If subcontractors are not included, then it would appear that a simple decision to use more subcontractors on the job would register on the summary as a labor shortage because the total manpower hired by the joint venture would decline. Obviously, this makes no sense.

Third, even assuming for the sake of argument that the categories were meaningful, there is no reason to believe that a decline in hours worked in a month is caused by a labor shortage. There are dozens and dozens of other possible reasons. The joint venture could have had a dispute with its bank, and could have reduced its payroll. The immigration authorities could have raided the Montgomery Point site.[6] The Government may have failed to get a necessary permit, and so slowed performance. An unexpected rock formation might have been uncovered, and so slowed performance. A simple demonstration that fewer hours were

---

6 There is reason to believe that something like this happened once or twice. We have made inquiries to Fireman, but have not yet received a response.

worked than planned does <u>not</u> prove (or even suggest) that a labor shortage was the cause.

Indeed, in the initial complaint, Fireman Fund admits that there were business reasons (other than a labor shortage) for avoiding certain hiring in 2000. Fireman complained that perceived problems with fly ash, and related matters, disrupted the hiring of concrete finishers and carpenters in 2000:

> The craft shortages at the Montgomery Point Project were a direct result of the Government's interference with the local labor market and the Montgomery Point Project, due to the Government's actions at Pine Bluff <u>and due to the start-stop conditions</u> the Joint Venture experienced in the concrete work <u>arising from the defective mix design</u>.

Complaint, ¶ 46 (emphasis added).

We do not concede that United States was responsible for any defect in the fly ash, or any delays that may occurred. But we do agree that such a problem could affect the rate of hiring and the number of hours worked in a particular period.

In summary, even assuming for the sake of argument that the joint venture employed fewer total employees per month (than initially planned) during the months from October 2000 through May 2001, there is no reason to conclude from the summary exhibit offered that the cause of such shortfall was a labor shortage.

C. <u>The Summary Does Not Support Consequential Damages</u>

Even if the summary were meaningful, it would not support the consequential damages alleged in the complaint and the amended complaint. In the initial complaint, Fireman alleged that consequential damages flowed from shortages of carpenters and concrete finishers. Complaint, ¶¶ 24,46-47. Similarly, in the amended complaint, Fireman alleged that a lack of skilled workers caused consequential damages. <u>E.g.</u>, Amended Complaint, ¶¶ 77-78.

In contrast, the summary purports to show only "Average Monthly Manpower." There could be huge surpluses of carpenters and concrete finishers and other skilled workers reflected in the summary exhibit, but very low levels of unskilled workers, and the summary exhibit would still show a net labor "shortage." Thus, even assuming for the sake of argument that the summary exhibit demonstrated a labor shortage, there is no way to tell from the summary whether there was a labor shortage in any category of workers relevant to the damages claimed.

D. <u>Raytheon's Advocacy Is Not Evidence</u>

In the Fireman Statement, the only "evidence" cited by Fireman in addition to its summary exhibit are various arguments and predictions made by Raytheon to the contracting officer for the Pine Bluff contract. Arguments and predictions offered by Raytheon to the contracting officer for the Pine Bluff contract

do not bind the United States. Furthermore, such statements are not even admissible evidence because advocacy submitted to the contracting officer are not records relied upon by Raytheon in the ordinary course of business to make business decisions, and so do not fall within the business record exception to the hearsay rule.

In any event, even if the Raytheon statements were admitted into evidence, none of the quoted statements say that there was a labor shortage -- anywhere.

As noted above, Fireman has offered to produce <u>no credible evidence</u> of any labor shortage at the Montgomery Point dam.

## IV. Fireman Has Made No Plausible Offer Of Proof That One Modification To The Pine Bluff Contract Caused A Labor Shortage Of All Construction Workers In An Eight-State Region

The Fireman Statement alleges that modification 89 to the Pine Bluff contract created a labor shortage. <u>E.g.</u>, Fireman Statement, at 9. Fireman alleges that this single modification created a labor shortage of all classes of construction workers in an eight-state labor market.

We address the Fireman Statement in three subsections below. First, we place modification 89 to the Pine Bluff contract in some context. Second, we demonstrate that the Fireman Statement fails to even attempt to support the eight-state labor shortage that Fireman has alleged. Third, we demonstrate that the more narrow "offer of proof" stated by Fireman does not supply any

rational basis for a labor shortage claim, even if the facts alleged were true.

A. The Start Of The Pine Bluff Work Was Delayed

On June 24, 1994, the Army Armament, Munitions & Chemical Command ("Armament Command") announced a solicitation for the Pine Bluff project. A14-15. The J.A. Jones Construction Company ("JA Jones") (later, part of the joint venture) had knowledge of the solicitation; JA Jones was on the "Pine Bluff Bidder's Mailing List" in 1994. A16,24.

On July 25, 1997, the Armament Command announced in the Commerce Business Daily that it had awarded the Pine Bluff contract, a "$511,608,405 cost-plus-award-fee/firm-fixed-price contract." A bid protest prevented the start of work. Amended Complaint, ¶ 22. Subsequently the project was delayed until the United States could obtain necessary permits. A34. The notice to proceed was issued on January 15, 1999. A34; Amended Complaint, ¶ 24.

In February 2000, the United States, through an administrative contracting officer employed by the Army Corps of Engineers ("Corps") in Huntsville, Alabama, increased the Pine Bluff contract price by approximately $1.8 million to account for certain increased costs associated with the delay. A33-34 (modification 69); A36 ("material, subcontract, equipment and straight labor escalations") (price negotiation memorandum).

In May 2000, the United States settled the remainder of the costs associated with the delay to the notice to proceed in modification 89. A43-47. Modification 89 increased the price of the Pine Bluff contract by $22.5 million, to compensate for additional costs associated with the delay -- including labor costs increased by a union agreement covering the period May 2000 through December 2001, A45, and "travel allowance and per diem" payments of $15 per day or $40 per day "to be competitive with other project<u>s</u> in the area." A46 (emphasis added). The price negotiation memorandum states that modification 89 "compensates the contractor for schedule impacts associated with changed labor market conditions due to the delay of the Government in the issuance of the aforementioned Notice to Proceed." A50.

The phrase "labor shortage" does <u>not</u> appear in the price negotiation memorandum. <u>See</u> A48-57.

In November 2001, modification 209 converted certain CLINs from fixed price to cost reimbursement. A59; <u>see</u> A58-73. In the original complaint, Fireman alleged that the United States was liable to Fireman because the United States entered into modification 209. <u>E.g.</u>, Complaint, ¶¶ 37-48. In the amended complaint, Fireman mentions modification 209, but does not appear to allege that liability flowed from that modification. Amended Complaint, ¶ 63. In the Fireman Statement, modification 209 is not mentioned. It appears that Fireman has now completely

abandoned any claim that the United States is liable to Fireman because the United States entered into modification 209.

B. Fireman Fails To Measure The Eight-State Labor Market

For obscure reasons, Fireman divides the relevant labor market for its "labor shortage" claim into the Arkansas market, and a seven-state "traveler" market. E.g., Fireman Statement, at 12 ("There were two labor markets affected by the Pine Bluff Modification [modification 89] that caused the Montgomery Point labor shortage."). In any event, Fireman alleges that modification 89 caused a labor shortage for all classes of construction workers in this eight-state region:

> Prior to the Pine Bluff Modification being issued May 19, 2000, Montgomery Point was successfully recruiting traveler labor, particularly from Mississippi, Louisiana, Texas, Florida, Alabama, Tennessee and Oklahoma, as it anticipated doing in its Bid. Montgomery Point hired 21 travelers from Mississippi, 11 travelers from Louisiana, 6 travelers from Texas, 5 travelers from Florida and 2 travelers each from Alabama, Tennessee, and Oklahoma prior to the Modification. These numbers are relatively small because Montgomery Point had not entered its most significant hiring period for concrete operations before the Modification as previously discussed.
>
> Comparatively, prior to the Modification, Pine Bluff was not paying travel allowances or per diems and, as a result, not hiring meaningful numbers of travelers: Pine Bluff hired 4 travelers from Mississippi, 5 travelers from Texas, 1 traveler from Florida, 4 travelers from Oklahoma and no travelers from Louisiana, Alabama, or Tennessee during this time period.

Fireman Statement, at 14-15 (emphasis added); id. at 17-18 (Arkansas). Fireman states that the seven-state "traveler" labor market is one of two labor markets where a "shortage" of travelers was allegedly created by modification 89:

> Overall, after the Modification, Pine Bluff hired 870 travelers, compared to the 26 travelers it hired prior to the Modification. These traveler employees were hired from the same labor pool that the Montgomery Point Project was relying on prior to and after the Modification [modification 89].

Id. at 16 (emphasis deleted and emphasis added). Similarly, Fireman alleges that it suffered from a shortage in the Arkansas market caused by modification 89. Id. at 17-18.

In the course of rattling off numbers of workers (apparently gathered from payroll records), Fireman aggregates all classes of construction workers to "offer to prove" a labor shortage. E.g., id. at 13 (unsupported summary exhibits); id. at 15 ("before the Pine Bluff Modification, Montgomery Point hired 69 travelers, while Pine bluff hired only 26 travelers"); id. at 16 ("after the Modification, Pine Bluff hired 870 travelers . . . Montgomery Point hired . . . a total of 419 travelers compared to Pine Bluff's 870 travelers"). Accordingly, Fireman is alleging a labor shortage in all classes of construction workers. Indeed, this is confirmed by various damages calculations, which include "additional" wages and benefits paid to all classes of construction workers. E.g., id. at 20 (damages include per diem

costs for laborers, carpenters, operators, ironworkers, and finishers); id. at 21 (damages include additional overtime for laborers, carpenters, pile-drivers, operators, electricians, ironworkers, truck drivers and finishers).

Fireman alleges shortages in these gigantic labor markets -- but offers no proof relevant to those markets. Indeed, the markets are not even measured. Fireman does not offer to prove how many construction workers were in Arkansas, or in the seven surrounding states. Fireman does not even attempt to calculate the size of the "traveler" labor pool in the seven-state area. With no information about the size of the relevant markets, there is no rational way to evaluate any claim of a shortage.

In summary, Fireman alleges a shortage of all classes of construction workers in an eight-state region, but offers no proof that any such shortage existed.

C. Fireman Fails To Offer To Prove Any Significant Competition For Labor From Pine Bluff

Although Fireman uses the term "labor shortage" in the amended complaint, its offer of proof does not allege any facts that, if true, would prove either a labor shortage at Montgomery Point or a labor shortage in the eight-state region. Instead, Fireman merely offers to prove that Pine Bluff was more successful in attracting out-of-state construction workers after modification 89 was executed. Even assuming for the sake of argument that Fireman could prove that Pine Bluff had more

success recruiting labor from outside Arkansas after modification 89 was executed, Fireman still would not have demonstrated a labor shortage.

In other words, Fireman has not offered to prove that there was any moment in time when there was any class of employee needed at the Montgomery Point site that the joint venture was unable to hire with reasonable efforts.

In its offer of proof, Fireman analyzes payroll records, assuming that the Pine Bluff project and the Montgomery Point project were the only two employers competing in the seven-state region:

> Without the Pine Bluff Modification . . . a substantial portion of the 750 travelers from Mississippi, Texas, Florida, Oklahoma, Louisiana, Alabama, and Tennessee out of the 870 travelers hired at Pine Bluff after the Modification, would have been employed by the Joint Venture at Montgomery Point.

Id. at 17. This sentence is only plausible if all construction workers in the seven-state region had only two choices: Pine Bluff and Montgomery Point.

Of course, there is no reason to make this assumption -- and Fireman offers no reason.

The identified eight-state labor market was vast. Construction workers had many options. See e.g., A13 (declaration of Mr. Wallace) (many carpenters abandoned Montgomery Point in favor of the Greenville Bridge project).

Furthermore, Fireman assumes a one-for-one competition for out-of-state "traveler" employees hired by Pine Bluff without offering any proof that Montgomery Point wanted or needed to hire those same employees at the time that Pine Bluff hired them. This is another unreasonable assumption. Quite simply, the job at Pine Bluff was different from building a dam, and so the labor forces needed at Pine Bluff and at Montgomery Point were significantly different.

For example, upon examining a database provided to us by counsel for Fireman, we identified 899 out-of-state employees working at Pine Bluff, and discovered that 336 were electricians. A74. The second highest category of "travelers" at Pine Bluff was pipefitters -- 199 pipefitters. Thus, nearly 60 percent of the Pine Bluff travelers were electricians and pipefitters. This data is consistent with other calculations from the same database showing that the two largest categories of employees at Pine Bluff (both Arkansas workers and travelers) were electricians and pipefitters. A2.

In contrast, the database provided to us by counsel for Fireman, showed <u>no electricians</u> (unless there was an electrician among the 13 workers in the miscellaneous category) hired by the joint venture <u>at Montgomery Point</u>. A2. The joint venture did employ some pipefitters, but it was only the third-highest category at Montgomery Point. A2.

In the original complaint, Fireman highlighted its alleged need for carpenters and cement finishers. Complaint, ¶ 24. However, our examination of the database provided by Fireman's counsel reveals that only 33 travelers at Pine Bluff were carpenters (only slightly more than three percent of the Pine Bluff travelers) and only 58 travelers were cement masons (approximately six percent of the Pine Bluff travelers). Thus, only a small percentage of the travelers allegedly denied to Montgomery Point were actually from those skill classes (carpenters and cement finishers) that the joint venture allegedly needed at some point in time.

In summary, there is no reason to assume any meaningful competition between Pine Bluff and Montgomery Point for any particular class of construction workers. In general, they needed different types of work performed by different types of workers.

Of course, it is possible that at some point in time there was some competition between Pine Bluff and Montgomery Point for some employee. However, Fireman has offered no proof.

All that Fireman has offered to the Court are a handful of summary exhibits which tally payroll data into vague categories based upon unreasonable assumptions about what labor markets were material, and based upon unreasonable assumptions about what

groups of employees were sought by Pine Bluff and Montgomery Point at various times.

V. Fireman Offers No Legal Authority

The basic premise of the "labor shortage" claim is that the United States breached the Montgomery Point contract by making a modification to the Pine Bluff contract. This basic premise was rejected by the United States Supreme Court more than 80 years ago. Horowitz v. United States, 267 U.S. 458, 461 (1925).

In general, the United States is free, as sovereign, to conduct its public business, even if actions in one sphere may affect in some way a government contractor. There are certain limited exceptions to this rule, but Fireman has failed to demonstrate that the labor shortage claim falls within any relevant exception.

A. Fireman Has Abandoned Its Superior Knowledge Claim

In the original complaint, Fireman made two superior knowledge claims: (1) the United States had superior knowledge prior to contract award, and (2) the United States had superior knowledge when negotiating a settlement of the joint venture's delay claim in 1999 (Montgomery Point contract modification 41). Complaint, ¶ 23 ("At no time during the bid and solicitation process did the Government advise the Joint Venture of the existence or scale of the Pine Bluff Project."); id. ¶ 35 ("Prior to learning about the Government's actions, the Joint Venture

negotiated Modification Number 41 for price escalation due to the funding shutdown with the Government upon remobilization. During the negotiations, the Government did not disclose the events taking place at the nearby Pine Bluff Project."). Both are abandoned in the Fireman Statement.

1. <u>Pre-Award Superior Knowledge No Longer Alleged</u>

The Fireman Statement alleges that liability for the purported labor shortage flows from modification 89 of the Pine Bluff contract, executed in May 2000. Obviously, neither the United States nor the joint venture could have predicted what modifications would be made to the Pine Bluff contract in 2000 prior to entering into the Montgomery Point contract in 1997.

In the original complaint, Fireman did not rely upon modification 89 as the basis for its pre-award superior knowledge claim. Instead, Fireman alleged that the United States had superior knowledge of "the existence or scale of the Pine Bluff project." Complaint, ¶ 23. This allegation is never mentioned in the Fireman Statement, and so should be considered abandoned.

In any event, the earlier claim was without merit. JA Jones, one of the partners in the joint venture, was on the bidders list for the Pine Bluff project in 1994. A24.

1. <u>Modification 41 Superior Knowledge Not Alleged</u>

Similarly, neither the United States nor the joint venture could have predicted what modifications would be made to the Pine

Bluff contract in 2000 prior to entering into modification 41 to the Montgomery Point contract in 1999.

Modification 41 compensated the joint venture for certain delays to the Montgomery Point project caused by the United States "during the period 13 January 1998 through 23 June 1998." A84. Modification 41 was executed by the parties on August 10, 1999. A84.

In the original complaint, Fireman alleged that "[d]uring the negotiations, the Government did not disclose the events taking place at the nearby Pine Bluff Project." Complaint, ¶ 35. It is not clear what Fireman contended were the relevant "events taking place," but those events could not have been modification 89 to the Pine Bluff contract -- because that modification was not executed until the following year (May 2000). The Fireman Statement makes no mention of any superior knowledge in connection with the negotiation of modification 41 to the Montgomery Point contract, and thus this claim should be considered abandoned.

In any event, any such claim was released by the joint venture. When negotiating modification 41, the joint venture had knowledge that the labor market was changing, and its internal accounting for the proceeds of modification 41 included $499,900 for "labor escalation." A83. When agreeing to modification 41,

the joint venture provided the United States with the following release:

> A. SCOPE OF MODIFICATION. To provide for complete and final payment for settlement of the claim of all costs, including interest and Attorney Fees, associated with the Contractor's shutdown, due to projected exhaustion of project funds, during the period 13 January 1998 through 31 June 1998, and any future impact associated with the suspension.
>
> . . . F. RELEASE. In consideration of the modification agreed to herein a complete and final settlement for all known and future costs arising from the Contractor's shutdown, due to projected exhaustion of project funds, J. A. Jones Construction Company and Guy F. Atkinson Construction Company (A Joint Venture) releases and discharges the Government, its officers, agents, and employees of any and all liabilities, obligations, claims, appeals, and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable, arising out of or in any way related to the events upon which their claim is based.

A85 (emphasis added).

B. Fireman's Alleged "Early Warning" Right Has No Basis

The Fireman Statement contains a section labeled "Superior Knowledge" but the claim outlined is based entirely the United States's prior knowledge that it would execute modification 89 to the Pine Bluff contract in May 2000. Fireman Statement, 30-31. Unlike the cases discussed in the Fireman Statement, the alleged prior knowledge of the United States is unconnected to any contract negotiation.

Instead, Fireman vaguely alleges some right to early warning of any Government action that might affect its contract:

> The Corps was aware the Joint Venture had no reason to know of or learn of the full scope and impact of the Pine Bluff Modification.
>
> . . . The Pine Bluff Modification also constituted "vital knowledge" to the Joint Venture because the Modification increased performance costs and extended the overhead for the Montgomery Point Project. As the court explained in Bateson-Stolte, the Corps was required to fully disclose to the Joint Venture any act which of necessisty would require the Joint Venture to pay higher wages.

Id. 30-31. The case cited in this text is inapposite; the allegation in the cited case was that the United States possessed superior knowledge prior to the award of the contract. Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 455 (Ct. Cl. 1959). Fireman cites no case holding that the United States has some free-floating "early warning" obligation concerning all actions that might affect a contractor.

In addition, Fireman also seeks indemnification for any consequence flowing from any Government action that might affect its contract:

> The Modification [modification 89 to the Pine Bluff contract] not only required the Joint Venture to pay higher wages to try and attract urgently needed labor, but the Joint Venture also paid per diem, relocation pay, insurance benefits, vacation pay, travel pay, overtime to increase weekly wages and also hired professional recruiters. Furthermore, the Corps-created labor shortage caused the

> Joint Venture to experience delays and loss of productivity during its performance of the Montgomery Point Project.

Fireman Statement, 31. Such a claim does not fall within the "superior knowledge" doctrine. More importantly, such a claim fails, as a matter of law. Horowitz, 267 U.S. at 461 (no liability to a government contractor for general and public actions).

C. Fireman Has Not Alleged Any Purposeful Interference

The Fireman Statement cites board cases holding that the United States may not purposefully interfere with the performance of a government contract. Fireman Statement, 33-38. Assuming for the sake of argument that this vague legal principle is supported by certain cases, such cases are inapposite. Fireman has not alleged that the United States purposefully interfered with the performance of the Montgomery Point contract.

D. Fireman Has Not Alleged Any Constructive Change

The Fireman Statement repeats the cases cited for its "purposeful interference" principle, and re-labels its claim "constructive change." Id. 38-39. The same flaw in the legal analysis persists. Fireman has not alleged that the United States purposefully interfered with the performance of the Montgomery Point contract.

SUMMARY

Fireman has failed to offer to present any contemporaneous document or testimony to prove that there was a labor shortage at Montgomery Point, or a labor shortage in the eight-state labor market that Fireman alleges to be the relevant labor market. Furthermore, Fireman appears to have ignored obvious evidence refuting its unsupported hypothesis that such labor shortages existed.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

S/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

S/ James W. Poirier
JAMES W. POIRIER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St, N.W
Washington, D.C. 20530
Tele: 202-616-0856
Fax: 202-514-7969

August 12, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on August 12, 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT DESCRIBING THE PURPORTED "LABOR SHORTAGE" CLAIM" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

S/ James W. Poirier