**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **FIREMAN'S FUND INSURANCE COMPANY, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **Case No. 04-1692C**<br>**Judge Christine O.C. Miller** |

**Plaintiffs' Reply to Defendant's Response to the Statement of Claim**

Pursuant to the Court's Order dated July 21, 2008, Plaintiffs Fireman's Fund Insurance Company, American Home Assurance Company, Fidelity and Deposit Company of Maryland, Universal Underwriters Insurance Company and J.A. Jones Construction Company and Guy F. Atkinson Construction Company, a Joint Venture ("Plaintiffs"), by counsel, hereby submit their Reply to Defendant's Response to the Statement of Claim regarding the labor shortage created by the U.S. Army Corps of Engineer's ("Corps" or "Corps of Engineers") at the Montgomery Point Lock and Dam Project ("Montgomery Point Project") in Arkansas.

## I. Introduction

Based on the Defendant's Response to the Plaintiffs' Statement of Claim ("Defendant's Response"), Plaintiffs believe there is a misunderstanding as to the procedures mandated by the Court on July 21, 2008. In this regard, Plaintiffs first seek to review the Court ordered procedures, which were originally requested by

the Defendant. On July 21, 2008, during a status conference ("Status Conference") with the Honorable Christine Odell Cook Miller, the Defendant requested an unusual but potentially productive procedure to clarify "brief facts in law" on the "nature of [the Plaintiffs'] claim." More specifically, the Defendant made the following request of the Plaintiffs:

> [W]hat I would suggest to counsel is we might be able to set up some kind of format where they'll set forth some kind of <u>brief facts in law</u> on what the <u>nature of their claim for the superior knowledge</u> or however they want to construe it.
>
> The idea is that whatever they say, <u>I'm going to say that as a matter of law they have no claim</u>.

Status Conference transcript ("Transcript"), p. 16 (emphasis added).

The Defendant focused on two issues to be specifically addressed in the Statement and Responses. First, the Defendant requested a clarification as to the scope of the labor market in question. The second issue raised by the Defendant related to the timing of the Pine Bluff Arsenal Demilitarization Project ("Pine Bluff Project") Modification Part B and when the Corps obtained superior knowledge as to the Modification. Both the Plaintiffs and the Court understood these to be the Defendant's two primary issues of concern:

> THE COURT: What [Mr. Watt is] talking about is whether you can define these parameters without having the Court define them, and I think in the first instance you ought to try. I may have cut you off. <u>You said the problems were the timing and the notion of defining a relevant labor market</u>. What other problems?

<u>Id</u>. at 21-22 (emphasis added).

The Court granted Defendant's request and setup an informal process to clarify the issues raised by the Defendant:

> So what Mr. Poirier would like to test is, with those parameters is there a cognizable claim. I think we could test it.
>
> You could state your theory in three or four ways such that it would admit some factual differences. Then the law's going to be the law. Both sides can look at the law and see if the law recognizes such a claim. If it does, even under the Helene Curtis general notion of superior knowledge, that's good enough to get us started on discovery.
>
> . . .
>
> I think now we could deal with the basic contours of a claim in terms of whether we've got a breach of some sort here, whether it's a superior knowledge aspect, whether we have a frustration of business purpose, or any other course of conduct that is related to performance of a contract that we can look at, and believe me, that's not a problem if there is such a cause of action. We can look at it.

Id. at 30-31 (emphasis added); See also Transcript, p. 24 (Judge Miller: "Another one is for me to require you to file something with me where Plaintiffs would set forth their theory and the government would comment on that theory. Then Plaintiffs would refine that theory, and Plaintiffs would say based on everything we know this is the theory we're going to attempt to prove. And the government could take that view that this would be an appropriate time then for a motion to dismiss for failure of stated claim. That way there would be a little back and forth refining the matter, not left to informality.").

The Court then set a schedule for the filing of the Plaintiffs' statement of claim ("Plaintiffs' Statement"), the Defendant's Response, and the Plaintiff's reply thereto ("Plaintiffs' Reply").

In short, the Court and the Plaintiffs understood that the Plaintiffs were to set forth a statement of the Plaintiffs' legal theories while addressing the Defendant's two specific issues related to timing of superior knowledge and the relevant labor market.

In its most recent filing, the Defendant's Response states: "At the hearing on July 21, 2008, we repeated our concerns to the Court, <u>and a briefing schedule was established for Fireman to make an offer to prove some labor shortage</u>. Fireman has failed to do so." Defendant's Response, p. 2 (emphasis added). At no point during the Status Conference, however, did the Defendant request that the Plaintiffs "make an offer to prove some labor shortage," nor did the Court order that Plaintiffs' Statement address this type of proof in detail.

Based on the Defendant's seeming misunderstanding of the purpose of the Plaintiffs' Statement, it is not surprising that the Defendant perceived certain shortcomings in the Plaintiffs' Response. In the Defendant's Response, the Defendant argues that the Plaintiff's Statement has three significant flaws:

> 1. no plausible offer to prove that any labor shortage ever existed at the Montgomery Point dam;
>
> 2. no plausible offer to prove its allegation that modification 89 to the Pine Bluff contract created a labor shortage for all construction workers in an eight-state labor market; and
>
> 3. no plausible legal basis for liability.

Id. at 2.

Based on the Plaintiffs' understanding of the Court's Order, the Plaintiffs' Statement did not substantially address Defendant's issues (1) and (2) above. The Plaintiffs are eager to opine as to issues (1) and (2) in the proper format, such as motions and related briefings, and fact discovery and expert reports. Furthermore, the Plaintiffs are surprised that the Defendant would request specific proof when outstanding discovery requests still exist and no depositions have been taken.

The Plaintiffs assure the Court that through the discovery process, they have been developing more evidence to prove that the Montgomery Point Project labor shortage was caused by the Pine Bluff Modification Part B. In fact, based on the responses provided to Defendant's previous formal and informal requests in discovery for specific proof of the Montgomery Point Project labor shortage, the Plaintiffs have established clear and convincing evidence of the Montgomery Point Project labor shortage. The Plaintiffs suspended efforts to provide this proof and related analysis after the Defendant brought this issue before the Court by filing, without warning, Demonstrative Exhibits just prior to the Status Conference. Since then, the Plaintiffs have continued to develop causation evidence of the labor shortage and anticipate that a full expert report as to this very issue can be completed by the Court's deadlines, as revised.

Unfortunately, the Defendants' Response has provided minimal legal analysis or questions related to the Plaintiffs' legal theories and, in fact, the Defendant's minimal legal analysis distorts the Plaintiffs' causes of action. As

mandated by the Court, Plaintiffs' Reply will finalize the Plaintiffs' theories of relief. Additionally, Plaintiffs' Reply will clarify remaining questions of law before addressing one specific question of fact incorrectly emphasized and distorted in the Defendant's Response.

## II. Legal Theories

The Plaintiffs are seeking recovery based on three legal theories:

(1) The Superior Knowledge Doctrine;

(2) Breach of the Implied Duty of Good Faith and Fair Dealing; and

(3) Constructive Change/Breach of Contract.

Although the Plaintiffs' Statement clearly stated these theories in their Statement of Claim, the Defendants' Response mischaracterizes and confuses the legal theories throughout. Notably, the Horowitz case (one of only two cases cited by the Defendant in its brief) is inapplicable to Plaintiff's legal theories and the facts of this case. For the Defendant's benefit, the Plaintiffs will briefly reiterate the basis for their three legal theories. The Plaintiffs will then address mischaracterizations and other errors in the Defendant's Response.

### A. The Corps Failed to Disclose Superior Knowledge

As a brief summary, the Plaintiffs' superior knowledge claim is rooted in the seminal case of Helene Curtis, which states, "the Government, where the balance of knowledge is so clearly on its side, can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word." After describing four specific elements required under the superior knowledge

doctrine, the Plaintiffs' Statement analyzes these elements based on the Montgomery Point Project labor shortage caused by the Corps' issuance of the Pine Bluff Modification Part B:

(1) The Joint Venture performed without vital knowledge as to the Pine Bluff Modification Part B;

(2) The Corps was aware the Joint Venture had no knowledge of the Pine Bluff Modification Part B;

(3) The Corps specification requiring the investigation of labor conditions at Montgomery Point misled the Joint Venture; and

(4) The Corps failed to provide information about the Pine Bluff Modification Part B to the Joint Venture.

Plaintiffs' Statement, 30-32.

The Defendant's Response never addresses the four elements necessary for a superior knowledge doctrine claim. Instead, the Defendants' Response states that "[Plaintiffs have] Abandoned Its Superior Knowledge Claim." Such is clearly not the case. However, the Defendant is correct that Plaintiffs are not asserting "pre-award superior knowledge." Instead, the Corps breached the superior knowledge doctrine based on the Corps' knowledge of the Pine Bluff Modification Part B (1) at the time the Corps entered into the funding shortage modification with the contractor at Montgomery Point; and (2) upon the issuance of the Pine Bluff Modification Part B, which resulted in the Corps-caused labor shortage at the Montgomery Point Project.

### 1. The Corps Failed to Disclose Its Superior Knowledge at the Time of the Funding Shortage Modification

In December 1997, the Joint Venture was forced to suspend construction of the Montgomery Point Project because the Corps ran out of money to pay the contractor. As a result, the Joint Venture did not startup again until June 1998. The Joint Venture submitted a Request for Equitable Adjustment ("REA") related to the Corps-caused funding shortage shutdown/suspension on December 1, 1998. The funding shortage REA was subsequently settled on or around **August 10, 1999** through Modification P00041 ("Funding Shortage Modification"). Exhibit A.

At the time the Corps executed the Funding Shortage Modification at the Montgomery Point Project, the Corps had specific knowledge as to the Pine Bluff Modification Part B that subsequently caused the Montgomery Point Project labor shortage. The Defendant's Response states that the Pine Bluff Modification Part A was executed in February 2000 and the Pine Bluff Modification Part B was executed on May 19, 2000. Most importantly, though, the Corps had knowledge of the Pine Bluff Modification Part B on **June 8, 1998**, prior to the execution of the Montgomery Point Funding Shortage Modification executed on or around **August 10, 1999**.

As part of the Pine Bluff Modification Part B, the Corps prepared a "Price Negotiation Memorandum," which detailed the history that resulted in the submission of Modification Part A and B:

> The contractor [Raytheon] has entitled this portion of his overall Request for Equitable Adjustment as "Part B." "Part A", settled in early February of 2000,

> addressed material, subcontract, equipment and straight labor escalations.
>
> The contractor was given direction for the submission of this modification (Request for Equitable Adjustment) via Industrial Operations Command's letter IOC980003 dated 08 June 1998. Additionally the contractor was presented with further direction requesting the submission of a formal Request for Equitable Adjustment via Industrial Operations Command's letter PBIOC990003 date 26 January 1999.

Exhibit B, p. 1 ("Necessity for Change"). Industrial Operations Command ("IOC") letters IOC980003 and PBIOC990003 have not been produced to the Plaintiffs. The Plaintiffs will immediately seek production of these letters and other related documents in possession of the IOC.

In addition to IOC letters, the Pine Bluff REA Part B, submitted by Raytheon Construction Co. to the Corps, provides further proof that that Corps had extensive knowledge of the Pine Bluff Modification Part B prior to execution of the Montgomery Point Funding Shortage Modification:

> The Contactor originally submitted an analysis of cost impacts due to the Stop Work Order and Delay on June 17, 1999, per Raytheon Letter PBRDC990173 (Exhibit I-1). However, during discussions with the Government held June 16, 1999, it was mutually decided that the cost impacts associated with the current labor issues were to be deferred while Raytheon continued to investigate the issues related to the cost impacts and changes in craft availability.

Exhibit C, 2nd paragraph (emphasis added).

Thus, on June 16, 1999, the Corps knew that the cost impacts associated with the Pine Bluff Project labor issues were being deferred to a separate Modification. Subsequently, on or about August 10, 1999, the Corps executed

the Funding Shortage Modification without disclosing its superior knowledge related to the later executed Pine Bluff Modification Part B and the impact it would have upon the Montgomery Point Project labor market.

Furthermore, the Funding Shortage Modification release language in no way releases the Plaintiffs' labor shortage claim that was caused by the Pine Bluff Modification Part B. The relevant provisions of the Funding Shortage Modification read as follows:

> A. SCOPE OF MODIFICATION: To provide for compete and final payment for settlement of the claim of all costs, including interest and Attorney Fees, associated with the Constructor's shutdown, due to projected exhaustion of project funds, during the period 13 January 1998 through 23 June 1998, and any future impact cost associated with the suspension.
>
> . . .
>
> F. RELEASE: In consideration of the modification agreed to herein as complete and final settlement for all known and future costs arising from the Contractor's shutdown, due to projected exhaustion of project funds, J.A. Jones Construction Company and Guy F. Atkinson Construction Company, (A Joint Venture) releases and discharges the Government, its officers, agent and employees of any and all liabilities, obligations, claims, appeals, and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable, rising out of or in any way related to the events upon which this claim is based.

Exhibit A.

A plain reading of these clauses clearly indicates that the Funding Shortage Modification released the Corps from costs arising from the Contractor's shutdown or suspension. Here, the Plaintiffs are claiming costs

associated with the labor shortage arising from the Corps-issued Pine Bluff Modification Part B. The Pine Bluff Modification Part B was issued on May 19, 2000, well after the Joint Venture's execution of the Funding Shortage Modification on or around August 10, 1999.[1]

### 2. The Corps Had Superior Knowledge of the Pine Bluff Modification and Failed to Disclose Such Knowledge

As an alternative theory, the Corps breached the superior knowledge doctrine by failing to disclose the Pine Bluff Modification Part B to the Montgomery Point Project contractor after Modification Part B was executed on May 19, 2000. Plaintiffs' Statement clearly articulates the four elements required to prove a superior knowledge doctrine claim. Instead of addressing these elements, the Defendants' Response attempts to mischaracterize the stated legal theory as an "alleged 'early warning' right." Defendants' Response, p. 28.

At no point do the Plaintiffs allege an "early warning right" or even use the phrase "early warning" in their Statement of Claim. The Defendant's Response may be referring to the superior knowledge doctrine, which is clearly stated in Bateson-Stolte:

> If the [Government] knew it was going to do a thing which of necessity would require the [contractor] to pay a wage greater than that prevailing in the community in which its work was to be done, and the [contractor] was ignorant of this fact, it would seem that good faith required the [Government] to apprise

---

[1] The Defendant does note that Modification P00041 included an amount for "labor escalation." Defendant's Response, p. 27. However, this amount simply provided labor escalation for the 229 calendar days of delay associated with the Modification – certainly a proper component of the claim for the lengthy work shutdown. In no way did P00041 compensate the Joint Venture for the later Corps-caused labor shortage due to the Pine Bluff Modification.

> the [contractor] thereof. If [the Government] caused the increase in the wages [the contractor] had to pay, [the Government] is liable for the increase. It seems hardly necessary to cite authority for this statement, but this is the clear implication of the decision of the Supreme Court in United States v. Buettas . . . .

Bateson-Stolte, Inc. v. United States, 172 F. Supp. 454, 456-57 (Ct. Cl. 1959). Furthermore, the Defendant's confusion as to an "early warning" element in the superior knowledge doctrine may derive from Helene Curtis' statement of the doctrine: "the Government where the balance of knowledge is so clearly on its side, can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word." Helene Curtis, 312 F.2d at 778 (emphasis added).

The Plaintiffs' Statement reviews two other superior knowledge doctrine cases that have been applied to Government-caused labor shortages but are not addressed in the Defendant's Response. During the July 21st Status Conference, the Defendant submitted a Demonstrative Exhibit highlighting the J.A. Jones case. J.A. Jones Constr. Co. v. United States, 390 F.2d 886 (Ct. Cl. 1968). The Defendant is now silent on this case after apparently recognizing that the case involved a superior knowledge claim based on a Corps-caused labor shortage that affected the same contractor, J.A. Jones, that was detrimentally impacted by the Corps' Pine Bluff Modification Part B.

Perhaps more importantly, the Defendant's Response completely ignores Carolina Sec. Patrol. As previously described in the Plaintiffs' Statement, in Carolina Sec. Patrol, Inc., the General Services Board of Contract Appeals recognized Government liability for post-bid superior knowledge withheld by the

Government that resulted in a contractor labor shortage. GSBCA No. 5602, 81-1 BCA ¶ 15040. Notably, the Corps' superior knowledge as to the Pine Bluff Modification Part B is much more egregious than the superior knowledge withheld in Carolina Sec. Patrol because here the Corps issued the Modification, which resulted in the labor shortage at Montgomery Point.

### B. The Corps Breached the Duty of Good Faith and Fair Dealing

The Defendants' Response does not address the Plaintiffs' claim that the Corps-caused labor shortage at Montgomery Point by issuance of the Pine Bluff Modification breached the Government's duty of good faith and fair dealing. Instead, the Defendant's Response attempts to mischaracterize the legal theory as a "purposeful interference" claim. The Defendant provides no case law and no analysis suggesting the Plaintiffs' have misapplied the duty of good faith and fair dealing legal theory to the instant case.

While Plaintiffs' Statement did not raise a claim of "purposeful interference," Plaintiffs may decide to pursue such a cause of action. Based on information and belief, the Corps may have not only failed to disclose knowledge of the Pine Bluff Modification Part B to the Montgomery Point contractor, but, in fact, the Corps may have purposely withheld information related to the Modification from the Joint Venture. Plaintiffs reserve the right to pursue this cause of action after Plaintiffs receive and analyze the remaining requested discovery documents from the Government and depositions of Corps personnel.

### C. The Corps' Actions Constitute a Constructive Change/Breach of Contract

Once again, the Defendants' Response does not substantively address the Plaintiffs' constructive change claim. The Armed Services Board of Contract Appeals has clearly established that a breach of the duty of good faith and fair dealing can also be pursued under a constructive change claim: "in Government contract practice, breach of the duty of good faith performance is often manifested by the Government's violation of its implied duty not to hinder or interfere with the contractor's performance. . . . Such interference may be treated as a breach or a constructive change . . . ." J.A Jones Constr. Co., ASBCA No. 43344, 96-2 BCA ¶ 28517, at 142,420; accord Johnson & Son Erectors, ASBCA No. 24564, 81-1 BCA ¶15082, at 74,601. Thus, the implied duty not to hinder the performance of another party is redressable through a constructive change/breach of contract action.

## III. Factual Issues

As previously discussed, it is the Plaintiffs understanding that they were to "set forth their theory and the government would comment on that theory." Transcript, p. 24. Based on this understanding, the Plaintiffs will not address the specific factual disputes raised by the Defendant's Response related to the cause-effect relationship between the Pine Bluff Modification and the Montgomery Point Project labor shortage. Instead, the Plaintiffs' Reply will address both the misplaced conclusions and unfounded accusations stated in the Defendant's Response related to Labor Finders and its employee, Tracy Wallace.

As stated in Plaintiffs' Statement, "[a]fter recognizing it was clearly experiencing a labor shortage, the Joint Venture, in desperation for more labor, hired the professional recruiting firm Labor Finders in 2001, 2002 and 2003." The hiring of Labor Finders did not occur until June of 2001, when the Joint Venture recognized it was suffering a severe labor shortage that it could not alleviate through its own additional efforts. When Labor Finders was retained, the Joint Venture was not yet aware, nor had any reason to know, of the Pine Bluff Modification Part B. The retention of Labor Finders was at great expense to the Montgomery Point contractor; Labor Finders billed the Joint Venture $31.95 per man-hour but paid the employees $16.00 to $17.00 plus the cost of workmen's compensation insurance, general liability insurance and federal and state taxes, resulting in a significant net profit to Labor Finders.

While Defendant's Response discusses the contractor's retention of Labor Finders, the Defendant's analysis completely misses the primary purpose of hiring Labor Finders: <u>the Joint Venture contracted with Labor Finders based on Labor Finders' ability to locate desperately needed labor for the Montgomery Point Project</u>. The Montgomery Point contractor incurred substantial additional costs to retain Labor Finders and would not have done so unless it was suffering a substantial labor shortage. Instead, the Defendant's Response asserts that Mr. Tracy Wallace's testimony is "obviously very damaging to Fireman's case because it is at odds with Fireman's theory." The Defendant's Response fails to elaborate as to what aspects of Mr. Wallace's testimony are very damaging, or how Mr. Wallace's testimony is at odds with the Plaintiffs' theory. The Joint

Venture had no reason to disclose the Pine Bluff Modification to Labor Finders, and, in fact, it would have been counterintuitive for the Joint Venture to disclose such a fact that could then be used by Labor Finders as leverage to charge higher rates.

The Defendant's misunderstanding of Labor Finders and the labor shortage claim does not end there. The Defendant's Response goes on to state:

> What is most troubling to us about Mr. Wallace's testimony is that Fireman had no idea what he would say. In short, it does not appear to us that the "labor shortage" claim is based upon any reasonable investigation of the events at Montgomery Point. Instead, the "labor shortage" claim appears to be nothing more than a hypothesis – one never tested by any reasonable inquiry. This is disappointing, and leads to a waste of resources by the Court and the parties. In any event, the Fireman Statement fails to offer any credible evidence of any labor shortage.

Defendant's Response, p. 6.

The Plaintiffs obviously disagree with this statement. In actuality, the true "waste of resources" is the Defendant's Response, which obviously abandoned any meaningful discussion of the legal merits to the Plaintiffs' labor shortage claim in order to allege various specific, and spurious, facts to the Court. On the other hand, the Plaintiffs have complied with the Court's Order to provide a statement of cognizable claim, even though they are now being ridiculed by the Defendant for such compliance. The Plaintiffs are prepared to proceed with prosecution of the labor shortage claim and look forward to the establishment of firm discovery and expert report deadlines so that this matter can be expeditiously and successfully resolved.

## IV. Conclusion

As ordered by the Court, the Plaintiffs have provided a clear statement of cognizable claim. The Plaintiffs' labor shortage claim is based on three well-established legal theories: (1) the superior knowledge doctrine; (2) breach of the implied duty of good faith and fair dealing; and (3) constructive change/breach of contract. The Plaintiffs have also addressed the two issues previously articulated by the Defendant in the Status Conference. First, Plaintiffs have established that the timing of the Corps' superior knowledge arose either sometime before the Corps executed the Funding Shortage Modification or when the Corps knew the Pine Bluff Modification Part B was going to be issued to Raytheon. Second, the Plaintiffs' Statement delineated an eight state labor market from which both the Pine Bluff Project and Montgomery Point Project recruited labor after the Pine Bluff Modification Part B was executed. The Corps' decision to issue the Pine Bluff Modification afforded Raytheon a substantial advantage over the Joint Venture in recruiting that labor and thus permits recovery under any or all of the legal theories discussed.

In summary, the Plaintiffs have articulated three cognizable legal claims and answered the factual questions raised by the Defendant. In so doing, the Plaintiffs have complied with the Court's Order dated July 21, 2008. The Defendant, however, has not.

Respectfully submitted this 15th day of August 2008.

/s/ Robert G. Watt
Robert G. Watt, Esquire
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 Phone
(703) 893-8029 Facsimile
rwatt@wthf.com

Attorneys for Plaintiffs

Of Counsel:

Keith C. Phillips, Esquire
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 Phone
(703) 893-8029 Facsimile
kphillip@wthf.com

**EXHIBIT A**

## AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: J
PAGE OF PAGES: 1 2

2. AMENDMENT/MODIFICATION NO.: P00041
3. EFFECTIVE DATE: 08/06/99
4. REQUISITION/PURCHASE REQ. NO.: W41XDB-7050-7351
5. PROJECT NO. (if applicable):

6. ISSUED BY CODE W41XDE01
LITTLE ROCK DISTRICT
CORPS OF ENGINEERS
P O BOX 867/700 W CAPITOL AVE
LITTLE ROCK AR 72203-0867
DARREL L. JOHNSON C16 (501) 324-5010

7. ADMINISTERED BY (If other than Item 6) CODE

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) Vendor ID: 00022318
J A JONES CONST & GUY ATKINSON CONST JV
PO BOX 849
ROSEDALE MS 38732

CODE FACILITY CODE

(X) 9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
x 10A. MODIFICATION OF CONTRACT/ORDER NO.: DACW03-97-C-0025
10B. DATED (SEE ITEM 13): 07/21/97

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
96X3122 0017J0 09400 2500 M4L8M40 Mod Obligated Amount US $0.00
Increase: $5,500,000.00 EFT: T

### 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (X) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| x | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 52.243-4, Changes |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

MONTGOMERY POINT LOCK AND DAM, WHITE RIVER, DESHA COUNTY, ARKANSAS

A. SCOPE OF MODIFICATION: To provide for complete and final payment for settlement of the claim of all costs, including interest and Attorney Fees, associated with the Contractor's shutdown, due to projected exhaustion of project funds, during the period 13 January 1998 through 23 June 1998, and any future impact cost associated with the suspension. This modification is

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print): D.G. SICKLE PROJECT MANAGER
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): ANNIE M. McCLINTOCK 1:04
15B. CONTRACTOR/OFFEROR [signature] (Signature of person authorized to sign)
15C. DATE SIGNED: 8/10/99
16B. UNITED STATES OF AMERICA BY (Signature of Contracting Officer)
16C. DATE SIGNED

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE
30-105
STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SF 30 CONTINUATION SHEET

in conjunction with Modification Numbers P00025 (123 calendar days) and P00039 (106 calendar days), which provided for an additional 229 calendar days resulting from the suspension of work.

B. CHANGE IN SPECIFICATIONS: No Change.

C. CHANGE IN DRAWINGS: No Change.

D. CHANGE IN CONTRACT PRICE: The contract price is changedfrom $187,177,775.46 to $192,677,775.46 an increase of $5,500,000.00, as follows:

ADD THE FOLLOWING NEW CONTRACT LINE ITEM:

| CLIN | Description | Quantity | U/M | Amount |
|---|---|---|---|---|
| 0113 | Settlement of Claim | 1 | LS | $5,500,000.00 |

E. CHANGE IN TIME: No Change.

F. RELEASE: In consideration of the modification agreed to herein as complete and final settlement for all known and future costs arising from the Contractor's shutdown, due to projected exhaustion of project funds, J. A. Jones Construction Company and Guy F. Atkinson Construction Company, (A Joint Venture) releases and discharges the Government, its officers, agents and employees of any and all liabilities, obligations, claims, appeals, and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable, rising out of or in any way related to the events upon which this claim is based.

CONTRACT OFF: (501)324-5720

**EXHIBIT B**

# PRICE NEGOTIATION MEMORANDUM – CONSTRUCTION CONTRACTS

| PROJECT DESCRIPTION AND LOCATION: | CONTRACT NO: | |
|---|---|---|
| Pine Bluff Chemical Agent Disposal Facility<br>Pine Bluff Arsenal, Arkansas 71602-9500 | DAAA09-97-C-0098 | |
| CONTRACTOR NAME AND ADDRESS:<br><br>Raytheon Demilitarization Company<br>30 South 17 Street<br>Philadelphia, PA 19101 | CHANGE REQ NO:<br><br>PB-IOC-990003 | TYPE OF FIRM:<br>__ INDIVIDUAL<br>__ PARTNERSHIP<br>__ JOINT VENTURE<br>X CORPORATION<br>INCORPORATED IN THE STATE OF ____ |

APPROPRIATION DATA AND AMOUNT:

NECESSITY FOR CHANGE/REASON FOR OMISSION FROM ORIGINAL PLANS AND SPECIFICATIONS:

Revise the contract documents to incorporate the impact(s) caused by the delay in the issuance of the formal contract Notice to Proceed. The Notice to Proceed was delayed due to a formal bid protest and lack of Government required environmental permits.

This modification is associated with craft labor wage rate parity, modified/extended work schedules, craft labor travel/per diem, and craft labor attendance incentives for both the prime contractor and his subcontractors. The contractor has entitled this portion of his overall Request for Equitable Adjustment as "Part B". "Part A", settled in early February of 2000, addressed material, subcontract, equipment and straight labor escalations.

The contractor was given direction for the submission of this modification (Request for Equitable Adjustment) via Industrial Operations Command's letter IOC980003 dated 08 June 1998. Additionally the contractor was presented with further direction requesting the submission of a formal Request for Equitable Adjustment via Industrial Operations Command's letter PBIOC990003 date 26 January 1999.

GOVERNMENT REPRESENTATIVES (NAME AND ADDRESS):

Neal Graham, CEHNC-CD-TS-CA

CONTRACTOR REPRESENTATIVES (NAME AND ADDRESS):

D'Etta K. Costello, Raytheon Demilitarization Company, P. O. Box 20130, Pine Bluff, Arkansas 71612
Doug Autsolief, Raytheon Constructors, Inc., P. O. Box 20130, Pine Bluff, Arkansas 71612

PLACE AND DATE OF NEGOTIATIONS:

Negotiations were conducted via telephone conference on 25 April 2000.

FINAL NEGOTIATED PRICE(S):

Direct Costs - $0
Schedule Costs for Time/Impacts – $22,500,000 (See "Time Durations" paragraph below.)

Total Costs - $22,500,000

TIME DURATIONS:

The time issue was corrected/implemented with the formal contract Notice to Proceed. This modification compensates the contractor for schedule impacts associated with changed labor market conditions due to the delay by the Government in the issuance of the aforementioned Notice to Proceed. This modification requires the contractor to complete the project within the current contract performance period, and eliminates the need for any extensions to the current contract completion date of 07 December 2001.

INITIAL GOVERNMENT ESTIMATE/BASIS FOR UPWARD/DOWNWARD REVISION, IF APPLICABLE:

IGE - $2,746,922. Basis for upward/downward revision includes omissions in the IGE, circumstances/facts discovered during the technical analysis and accompanying DCAA audit, and the fact that the IGE used straight-line escalation assumptions throughout the calculations while the contractor was able to provide actual, audited labor proposed cost details. See attached Price Negotiation Memorandum for details.

ATTACHMENT: PRICE NEGOTIATION MEMORANDUM – RESUME OF NEGOTIATIONS

CEHNC FORM 965a
1 NOV 94

# EXHIBIT C

RDC

Raytheon Demilitarization Company

# REQUEST FOR EQUITABLE ADJUSTMENT (REA)
## Part B
## Volume I

## I. INTRODUCTION

Raytheon Demilitarization Company (RDC) and Raytheon Constructors, Inc. (RCI) (herein after "Raytheon") are submitting the enclosed Request for Equitable Adjustment (REA) due to the cost impacts resulting from the delay in the original Notice to Proceed date of September 1997 for the Pine Bluff Chemical Demilitarization Facility.

This REA identifies the costs that the Contractor would have included in its cost proposal if the proposal and commencement of work had been based on a January 1999 notice to proceed. These costs would not have been incurred but for the circumstances of the changes to availability of craft labor in 1999 - 2001. The Contractor originally submitted an analysis of cost impacts due to the Stop Work Order and Delay on June 17, 1999, per Raytheon Letter PBRDC990173 (Exhibit I-1). However, during discussions with the Government held June 16, 1999, it was mutually decided that the cost impacts associated with the current labor issues were to be deferred while Raytheon continued to investigate the issues related to the cost impacts and changes in craft availability. In addition to the on-going efforts by Raytheon, the Contractor herein provides its current actions taken and the plans for actions to address the impacts of current shortages of the number of crafts available and the necessary skill levels.

On December 1, 1999, Raytheon presented to the Government a list of the recommended actions for immediate preparation and review as a part of the subject of this REA. Following the December 1, 1999 video conference, Raytheon separated the original REA into two parts – Part A and Part B. The cost increases due to the changes in the craft availability and the skill levels of the craft personnel incurred due to the NTP delay are addressed in this REA - Part B. The REA separation of cost into two parts was documented in Raytheon letter PBRDC990348 dated December 15, 1999. (Exhibit I-2).